EX PARTE LEO HENRY, J. E. MARTIN AND KENNETH GREER.

No. A-1656. Decided October 13, 1948.
Rehearing overruled December 31, 1948.
(215 S. W., 2d Series, 588.)

316

*Mullinax, Wells & Ball* and *L. N. D. Wells, Jr.,* of Dallas, for relators.

*Allen Clark,* of Greenville, and *O. B. Fisher,* of Paris, for Greenville Cotton Oil Company and the Sheriff of Hunt County, F. A. Clifton, respondents.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

This is an original habeas corpus proceeding brought by relators, Leo Henry, J. E. Martin and Kenneth Greer, seeking their release from the custody of the sheriff of Hunt County, respondent.

In January, 1948, a majority of the employees of Greenville Cotton Oil Company went on strike to gain recognition of their union and a contract for fewer work hours and premium pay for overtime. One strike measure was to picket on the public streets

adjacent to the company's plant. The pickets carried banners, which bore this statement: "This company is unfair to organized labor. The employees are within their rights but the company refuses to recognize them."

Only Martin and Henry were employees of the company but all relators were members of the striking union.

The oil mill plant occupied two blocks, . with Bois D'arc Street on the west and Pickett Street on the south. On those streets were the only entrances to the plant. The main entrance was on Bois D'arc Street and it was used by employees and others having business with the plant. Three railroad spur tracks crossed Pickett Street from the southeast and extended, through the Pickett Street entrance, to the plant, where two of them came to a dead end. This entrance was used also by employees and by trucks.

The picketing in question crossed these spur tracks, and on several occasions as the railroads sought to deleiver freight cars to the plant their train crews refused to cross Pickett Street because of the picket line.

In February, 1948, Greenville Cotton Oil Company filed suit against the local union of the American Federation of Grain Processors, A. F. of L., and certain of its members, as well as all other members, as a class, to enjoin the picketing "upon or near" the spur tracks on Pickett Street and to enjoin the defendants from committing any acts which in any manner, by pickets, by threats or by violence, would interfere with the movement of cars into and out of the plant or the performance by the railroads of their duty to the plant as common carriers.

In substance, the company alleged that since there was no labor dispute between the defendants and any railroad using the spur tracks, the picketing of the tracks prevented the free flow of commerce into and from the plant by inducing the railway employees to engage in concerted refusal to serve the plant and constituted a "secondary boycott and secondary picketing of plaintiff's plant in violation of the Anti-trust laws of Texas and in violation of Article 5154, R. C. S. of Texas."

The defendants attacked the jurisdiction of the trial court on the ground that the matters complained of are exclusively regulated by the Federal Labor Management Relations Act of 1947, hence are subject to injunction only by federal courts.

Then they excepted to the petition because the acts complained of "constitute the peaceful exerecise of the rights of free speech, free communications and assembly guaranteed by the First and Fourteenth Amendments to the Constitution of the United States, * * * which cannot therefore be * * * impaired by denying to defendants in a dispute with an employer the right to communicate their views by peacefully picketing the establishment of plaintiff in order to enlist public opinion in their behalf." Affirmatively answering, they alleged a bona fide labor dispute between them and the plaintiff and a peaceful picketing, in the course of that dispute, of plaintiff's plant "by marching in the public street, * * * carrying banners advising the public of said dispute"; they denied that they had attempted to picket the railroad tracks or "any other property than that property on which plaintiff's mill is located"; they denied that they were interfering with the free flow of commerce or the transportation of commodities other than by peaceful picketing with truthful banners on public streets; they denied use of any threats, violence or physical force; and they alleged that their picketing constituted no physical obstruction to ingress or egress from the plant.

After a hearing the trial court granted a temporary injunction. The defendants, as a class, were forbidden to molest or interfere with railway employees on or in the vicinity of the tracks at or near plaintiff's plant whenever those employees were attempting to carry freight into or out of the plant; to picket at or near the railway tracks serving the plant in such manner as to prevent the railway employees from serving the plant; or to picket on, across, at or near or within 100 feet of the railroad tracks across Pickett Street while the railways were using or about to use them to transport freight into or out of the plant. There are other directions and recitals in the injunction order but they are not relevant to any issue at bar.

Three days later an affidavit was filed by the cotton oil company alleging that Relator Greer had violated the injunction by placing himself "upon and near" the spur track leading into the plant "with a picket placard by walking to and fro across said tract carrying said placard and thereby interfered with and prevented the movement" of a box car into the plant and had "refused to move away from said track and to withdraw himself 100 feet therefrom but maintained and continued to maintain a picket line on and across the track thereby preventing and interfering with the spotting of said loaded car" by the train crew. It alleged that Relators Martin and Henry had

"placed themselves at and near said railroad track, established a picket line on and across said track, refused to withdraw themselves and the picket line established by them 100 feet from said track, and refused to allow" the railroad employees to move certain cars into the plant.

Answering the affidavit, the defendants invoked the same constitutional provisions as in their answer to the injunction suit and denied that they had violated the injunction "except that some of them by oral statements and peaceful picketing on Pickett Street (which is the southern boundary of the plant of Greenville Cotton Oil Company, and is a public street) have advised the public that employees of Greenville Cotton Oil Company are on a strike." They alleged that their picketing was unattended by any character of interference with any railroad and constituted "no physical obstruction to ingress or egress" from the plant.

In adjudging relators guilty of contempt, the trial court found that they had violated the injunction "by interfering with trains of the railway companies entering the premises of Greenville Cotton Oil Company" and committed them to custody until they should purge themselves by assuring the court that "they will not hereafter in any manner again violate the injunction."

By this proceeding relators seek release from that restraint. They insist that the contempt order is void because the court has no authority to restrain them from peaceful picketing, and that the injunction itself is void, under the facts proved in the contempt proceeding, because it denies and abridges their rights of free speech and assembly guaranteed by the First and Fourteenth Amendments.

We have studied the testimony offered at the contempt hearing and which the trial court considered sufficient to show that relators had violated the injunction by "interfering" with railway trains entering the plant; and we find that the main question for decision is narrow.

On the night of March 8, 1948, Greer and an unidentified person were picketing the Pickett Street entrance when a train of the Cotton Belt Railway endeavored to spot a box car at the plant. This picketing was done by walking back and forth along the middle of the street across all three of the switch tracks. As the train approached to spot the box car, Greer walked from west to east across all three tracks, in view of the train crew,

carrying a banner, which read: "We are on strike at the Greenville Cotton Oil Company. We are picketing only this plant. We urge the public not to serve and cooperate with this company—we urge the public not to serve or patronize this company"; then he turned and began walking back from east to west.

When they saw this, the crew stopped the train. Whereupon one Hazelwood, railway division superintendent, who was helping in the effort to spot the car, asked Greer "if he wasn't violating the law," to which Greer replied that he "didn't think so." Hazelwood asked, "Didn't the injunction tell you not to come within one hundred feet of the tracks?", to which Greer replied, "This is a public street." Then one Rickard, agent for the railroad, said, "Greer, it was my understanding from Mr. Bringle (a member of the striking union) that Mr. Cox (another member) had placed a can west of the tracks one hundred feet and had instructed the pickets not to go beyond that can, is that right?" When Greer replied that he didn't know, Rickard asked, "Where is Bringle?" Greer said, "He is out there in the car." Rickard responded, "Let's go talk to him." Then Rickard and Greer went to an automobile parked on Pickett Street but beyond Bois D'arc Street and a full block from the railway tracks where Greer had been picketing. In it sat Bringle and five other members and officers of the union. According to Rickard, he then had this conversation with them: "I said, 'Bringle are you there' and he said, 'Yes'. I said, 'Well, do you boys intend to establish and maintain a picket line across our tracks while we try to put this car in?'—and there were two or three answers and (sic) said 'Yes'. And I said, 'OK. We won't attempt to cross your picket line.'" Rickard then reported to Hazelwood. The latter said he would like to talk to those in the automobile; so they went back to it, and Rickard stated to the men, "I would like for you to get out and meet my boss." Then followed introductions, and the conduct of those in the automobile was described as "gracious", "polite" and "courteous". Nevertheless, according to Rickard, they said they did not think the court had jurisdiction over the dispute and that they were not going to respect the injunction. That ended the conversations, and the box car was not spotted because the train crew would not cross the picket line.

No witness testified to any violence, threat of violence, or unseemly conduct in connection with these cnoversations. Although the contempt affidavit alleged that the president, secretary and Bringle had by reason thereof been guilty of contempt, the trial court regarded their presence in the automobile and the

conversation as presenting nothing of importance because his order found them "not guilty of the contempt charged against them."

While most of the witnesses said that Greer's picketing "prevented" the spotting of the car, all agreed that it was "peaceful picketing in a public street", without violence or threats, and that "Greer made no attempt to physically obstruct the train" or "to physically obstruct any ingress or egress from the plant"; that, although Greer picketed across the tracks, "nobody attempted to picket up and down" the tracks.

The testimony as to the picketing by Relators Martin and Henry related to a time different from that charged against Greer but was much the same, so we need not review it in detail. They were picketing to and fro along Pickett Street and across the spur tracks when the railroad attempted to spot four box cars in the plant, but the train crew refused to cross the picket line. The picketing was described as entirely peaceful and without threats or violence and constituted no "physical obstruction to anybody going in or out of that plant."

On the issue of violence, we briefly refer to two incidents. The witness Rhone, assistant superintendent of one railroad, after recounting the picketing by Greer, testified as follows: "Q. Mr. Rhone, had you or had you not *heard* of the picketing in that area *prior* to this time? A. Of the oil mill? (Objection sustained.) Q. Had you or not *heard* of violence in connection with the picketing *about which you have just been asked?* A. *I heard of the violence through our trainmen. They had told me about it on several occasions.*" (Italics ours.) It is not clear whether this related to Greer's picketing or not; but if it did, it was pure hearsay and was wholly incompetent as proof of any violence.

The witness Librand, yardmaster for another railroad, testified that on the morning of March 9, while he was trying to spot two cars in the plant, two unidentified persons were picketing the street and the tracks. He said that the train would not cross the picket line "on account of it not being safe." Respondents insist that a "reasonable mind could only conclude that there was a basis for the fear. Obviously, the threats were communicated by acts if not by words and such threats were effective." In the first place, this incident was in no way connected with relators; but if it were, the testimony that it was not safe

to cross the picket line was a pure conclusion without proof of any word or act to support it. Moreover, the witness positively said that the pickets "were peacefully marching on the public street."

So the competent testimony shows that relators did engage in picketing on a public street but adjacent to the premises and in front of one entrance to the plant of the employer with whom their union had a bona fide labor dispute; that their picketing was free of threats or violence, was not carried on by more than two pickets at any time and constituted no physical obstruction to anybody going into or coming out of the plant; that, however, it violated the trial court's order in being carried on within 100 feet of the spur tracks while the railway employees were using them in an effort to transport freight into the plant; and that it was intended to urge the railway employees "not to serve" the plant and that it accomplished that purpose.

■ That the injunction is void in so far as it attempts to restrain that sort of picketing is definitely settled by repeated decisions of the Supreme Court of the United States. Two cases squarely in point are Carlson v. State of California, 310 U. S., 106, 60 Sup. Ct., 746, 84 L. Ed. 1104, and Thornhill v. State of Alabama, 310 U. S., 88, 60 Sup. Ct., 736, 84 L. Ed., 1093.

In the Carlson case an ordinance of Shasta County, California, made it unlawful "for any person, in or upon any public street, highway, * * * or other public place * * * to picket in front of, or in the vicinity of, or to carry, show or display any banner, * * * or sign in front of, or in the vicinity of any * * * place of business or employment, for the purpose of inducing or influencing, any person to refrain from entering any such * * * place of business, or employment * * *." Carlson was one of 29 men engaged in picketing on U. S. Highway 99 in front of the Delta Tunnel Project, by walking to and fro a distance of 50 to 100 feet off the pavement but on the graveled portion of the highway nearest the project. Some of the pickets carried signs, variously inscribed, in such manner that they could be read by workers on the project as well as by travelers on the highway. That carried by Carlson bore the legend: "This job is unfair to CIO." During the picketing "vehicles and persons passed freely, without any molestation or interference, through the picket line from the highway to the project and from the project to the highway, and the traffic of persons and automobiles along the highway was not obstructed." Carlson did not threaten

or intimidate anyone and was entirely peaceful and orderly. No fellow picket committed any act of violence or any breach of the peace. Carlson was arrested on a charge that he "did picket and display signs and banners in a public place and in and upon a public highway in front of, and in the vicinity of the Delta Tunnel Project * * * for the purpose of inducing and influencing persons to refrain from doing and performing services and labor" at the project. His conviction was affirmed by the highest California court having judiction, over Carlson's protest that the ordinance violated the Fourteenth Amendment in abridging his freedom of speech, press and assembly. The Supreme Court points out that since the ordinance did not define the word *picket,* the term must be considered as covering "all the activities embraced by the prohibition against the carrying of signs in the vicinity of a labor dispute for the purpose mentioned", that it contains no exception as to the "truthfulness and restraint" of the information conveyed or as to the number of persons engaged in the picketing, and that while the ordinance requires proof of a purpose on the part of the picket to persue others not to do business with the employer, "such a purpose could be found in the case of nearly every person engaged in publicizing the facts of a labor dispute." Then, in reversing the case, the Court observes: "For the reasons set forth in our opinion in Thornhill v. Alabama, supra, publicizing the facts of a labor dispute in a peaceful way through appropriate means, whether by pamphlet, by word of mouth or by banner, must now be regarded as within that liberty of communication which is secured to every person by the Fourteenth Amendment against abridgement by a state."

In the Thornhill case an Alabama statute was very similar to the ordinance in the Carlson case. The complaint against Thornhill charged a violation of the statute in that "he did picket" the premises of the employer "for the purpose of hindering, delaying or interfering with or injuring its lawful business". Thornhill successively attacked the complaint, the testimony offered and his judgment of conviction as violative of his rights under the Fourteenth Amendment; but his contention was overruled by the Alabama courts. After noting that Thornhill's picketing was peaceful and free of harsh words or menacing manner, the Supreme Court says that such picketing is sought to be prohibited merely because it has for its purpose to advise customers of the dispute between employees and employer and thereby to induce them not to patronize the employer. Then it holds that the statute is nevertheless unconstitutional as abridging the right of free speech. "It may be that

effective exercise of the means of advancing public knowledge may persuade some of those reached to refrain from entering into advantageous relations with the business establishment which is the scene of the dispute. Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society. But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests." As to the suggestion by the State of Alabama that the statute is resricted to such activity as takes place at the scene of the labor dispute, that is, the premises of the employer, the court says, "The streets are natural and proper places for the dissemation of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."

In Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U. S., 287, 67 Sup. Ct., 552, 85 L. Ed., 836, 132 A. L. R. 1200, wherein a state court injunction against picketing which was "enmeshed with contemporaneously violent conduct" (such as beating and shooting truck drivers, window smashing, bombing and firing buildings) was sustained, the Supreme Court says, "We do not qualify the Thornhill and Carlson decisions. We reaffirm them. They involve statutes baldly forbidding all picketing near an employer's place of business. Entanglement with violence was expressly out of those cases. The statutes had to be dealt with on their face, and therefore we struck them down. Such an unlimited ban on free communication declared as the law of a state by a state court enjoins no greater protection here."

In Bakery & Pastry Drivers v. Wohl et al., 315 U. S., 769, 62 Sup. Ct., 816, 86 L. Ed., 1179, Wohl and Platzman peddled baked goods, which they bought from bakeries and sold and delivered to retailers. There were many such peddlers in the City of New York. Most of them finally became members of a local union of the International Brotherhood of Teamsters. After repeated unavailing efforts to persuage Wohl and Platzman to join, the union began to picket "in the vicinity of" some bakeries that were selling their products to Wohl and Platzman. This picketing was only for an hour or so each day and by not more than two pickets at one time. One placard bore the name of Wohl while the other bore the name of Platzman, and both stated:

"A bakery route driver works seven days a week. We ask employment for a union relief man for one day. Help us spread employment and maintain a union wage hour and conditions." Although finding that this picketing was peaceful and orderly, without violence or threats and created no disorder, the trial court enjoined the union from picketing either the bakeries from whom Wohl and Platzman bought or the retailers to whom they sold; and that action was affirmed by the appellate courts of New York. Stating that Wohl's and Platzman's "mobility and their insulation from the public as middlemen made it practically impossible for petitioners to make known their legitimate grievances to the public whose patronage was sustaining the peddler system except by the means here employed", the Supreme Court held that the injunction violated the union's right of free speech under the Fourteenth Amendment when it was not shown that the picketing was attended by any actual or threatened abuse of that right through excessive picketing.

In Schneider v. Irvington, 308 U. S., 147, 60 Sup. Ct., 146, 84 L. Ed., 155, a Milwaukee ordinance forbade the distribution of handbills on the streets. The petitioner stood, as a picket, on the street in front of a market and passed out handbills, which set forth his union's position on a labor dispute it then had with the market and requested citizens not to patronize the market. The state courts sustained his conviction for violating the ordinance on the ground that recipients of the handbills threw them down, thereby littering the streets. In reversing that judgment the Supreme Court said: "We are of opinion that the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibited a person rightfully on a public street from handing literature to one willing to receive it. Any burden imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution results from the constitutional protection of the freedom of speech and press."

In Senn v. Tile Layers Protective Union, 301 U. S., 468, 57 Sup. Ct., 857, 81 L. Ed., 1229, it is said that peaceful picketing "implies not only absence of violence, but absence of any unlawful act. It precludes any form of physical obstruction or interference with the plaintiff's business."

Applying those decisions to the case at bar, we have concluded that the acts proved against relators in the contempt hearing cannot be classed as anything but peaceful picketing. There-

fore the right to do them is one phase of the right of free speech guaranteed to relators by the First Amendment to the Constitution of the United States, which, under the Fourteenth Amendment, no state can abridge. And whether the effort at abridgment is by means of a statute or a court judgment, the result is the same; the effort is void. American Federation of Labor v. Swing, 312 U. S., 321, 61 Sup. Ct., 568, 85 L. Ed., 855.

██ Respondents contend that the acts of relators constituted a violation of the anti-trust laws of this state, Arts. 7426 and 7428, R. S., 1925, and Acts 1632, 1634, and 1635, P. C., 1925, and amounted to secondary picketing and secondary boycotting as defined and prohibited by Art. 5154f, Vernon's Anno. Civ. Stats., Acts 1947, 50th Leg., p. 779, ch. 387.

As we have seen, the conduct which was held contemptuous because in violation of the injunction granted in Greenville Cotton Oil Mill Co. v. Amer. Fed. of Grain Processors, A. F. of L., et al, amounted only to peaceful picketing, which not only is not unlawful but is protected by the First and Fourteenth Amendments. So it takes no writing to demonstrate that that conduct can in no sence be regarded as violative of the statutes cited. Moreover, if it may be conceded that it was the aim of those statutes to prevent relators from doing what they were proved to have done in this case, we would have to hold that the statutes are, to that extent, unconsitutional. So long as the fundamental law guarantees the right of a citizen to do a given act, that act cannot be effectually condemned either by statute or by judicial decree. Authorities, supra.

In this connection, it seems to be the position of respondents that since the employees of the railways would not cross the picket line manned by relators, the picketing and the consequent refusal of the railway employees to serve the employers' plant constituted such concerted action between relators and those employees as to amount of secondary picketing and boycotting and conspiracy in restraint of trade, as denounced by our statutes. Under the decisions of the Supreme Court already cited and discussed, picketing does not offend against the statutes merely because third parties who come to the area of the dispute may prove sympathetic to one disputant rather than to the other. We overrule the point.

Our holding does not conflict with Carpenters and Joiners Union et al v. Ritter's Cafe (Civ. App.), 138 S. W. (2d) 223,

149 S. W. (2d) 694, 315 U. S., 722, 62 Sup. Ct., 807, 86 L. Ed.,
1143, Borden Co. et al v. Local 133 (Civ. App.), 152 S. W. (2d)
828 (er. ref.), or Turner v. Zanes (Civ. App.), 206 S. W. (2d)
144 (er. ref. N. R. E.), cited by respondents.

In the Ritter's Cafe case union carpenters were picketing a
cafe which relator neither used nor needed carpenters and with
which, therefore, their union "had no labor dispute and with
whom it neither wished, nor was eligible, to contract in any
way." Ritter, owner of the cafe, had contracted with one Plaster
to construct a building, which was a mile and a half distant
from the cafe and wholly unconnected with it. Plaster was free
to employ such labor as he chose; and because he did not hire
union laborers, the carpenters' and painters' union began picket-
the cafe, although the cafe employees were members of the
Hotel and Restaurant Employees Local 808. Our Texas courts
held that this picketing was a violation of the anti-trust statutes
and enjoined it, but did not forbid picketing at the building be-
ing constructed by Plaster or any other communication of the
facts of the dispute. The Supreme Court of the United States sus-
tained the injunction and said that the statutes of "Texas had
undertaken to localize industrial conflict by prohibiting the
exertion of concerted pressure directed at business wholly out-
side the economic context of the real dispute, of a person whose
relation to the dispute arises from his business dealings with
one of the disputants."

In the Borden case, supra, (152 S. W. (2d) 828) Local 133
of the International Brotherehood of Teamsters had a labor
dispute with the Borden Company. Brazos Ice Company pur-
chased milk from Borden, which it sold at retail. Brazos had
only three employees, all of whom were members of the Ice
Handlers Union, with which Brazos had a contract covering its
members; and neither it nor any of its employees had any dis-
pute with the teamsters' union. Teamsters' Union, nevertheless,
picketed Brazos' place of business, its pickets carrying placards
which read: "This place is selling milk from dairies who locked
out their employees." Noting the absence of any labor dispute
between Brazos and the union and the impossibility of one, the
court says that while there was no evidence of violence on the
part of the union members the picketing "was admittedly in-
stituted by defendant union in an attempt to force" Brazos,
through injury to its business, to discontinue the sale of milk
processed by Borden, "an act in direct violation of the anti-
trust laws of the state."

In Turner et al v. Zanes et al, supra (206 S. W. (2d) 144), Zanes et al charged many strike activities against Turner et al which they claimed were unlawful and subject to be enjoined. According to the opinion of the court of civil appeals, those activities "pursuant to strike were twofold in nature: First, consisting of letters, telegrams, personal calls, etc., giving notice to strike and invoking the proviso in contracts of truck line defendants against crossing of picket lines; second, the actual picketing of plaintiff's places of business, consisting of the usual marching to-and-fro before the establishment involved in the dispute, accompanied by the display and carrying of .signs, placards or banners bearing statements of grievance touching the particular controversy." After pointing out that this second phase of strike activity was permitted along with such regulations as the trial court considered reasonable under the facts, the court says, "As viewed by the trial court, it was only the threats, intimidation, acts of coercion, unlawful interference with contractual relations and acts violative of the anti-trust laws that became items of restraint", and the injunction was sustained. However, the court reformed the judgment by striking a proviso that the "picket line shall be for the limited purpose of persuading employees of plaintiff to leave their employment or dissuading third parties from becoming employees," observing that to that extent "the judgment would appear as unduly limiting appellant's right to disseminate information relevant to its interest concerning the facts of a labor dispute," and citing the Thornhill and Carlson cases, supra. Then the court referred to paragraph 8 of the trial court's judgment as adequately protecting the rights of the strikers. Under that paragraph they were accorded the right of publicizing the controversy with plaintiffs in an accurate, peaceful and truthful manner, without threats, coercion on intimidation, actual or implied, against any of the parties herein mentioned, *except as herein limited.*" (Italics ours.) Although the judgment of the court of civil appeals left undisturbed that part of the judg- which prohibited picketing, peaceful or otherwise, within 100 feet of the railroad track entering the employer's warehouse as well as that part which required pickets to withdraw, after notice, if railway or truck operatives refused to deliver or accept freight because of the presence of pickets, until delivery or acceptance had been accomplished, the petitioners made no specific attack on those phases of the judgment in their application for the writ of error. Therefore, we concluded that the judgment, as reformed, adequately protected petitioners' rights under the facts of the case and under the questions raised, and we refused

the application, no reversible error. However, it now appears that in the case at bar the trial court construed that case as authorizing him to enjoin peaceful picketing (as constituted under the facts of this case) within 100 feet of the spur tracks while the railways were using or about to use them to transport freight into or out of the plant. Therefore, to the extent that Turner et al v. Zanes et al, supra, may be construed as authority for the proposition that such picketing may be so limited or that such picketing may be ordered suspended in the event it has the effect to persuade railway employees not to serve the business of the employer, under facts like those here presented, it is overruled; for those limitations are directly contrary to the pronouncement in Thornhill v. Alabama, supra, that "the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests."

■■ Since the right to picket existed under the facts of this case and under the decisions of our highest court, we hold that the right extended to all portions of Pickett Street adjacent to, and in the vicinity of, the plant of the Cotton Oil Mill Company with which relators and their union were in dispute. So long as the pickets did not physically obstruct the spur tracks and thereby nullify or seriously impair the right of the railways to use the street, they had the same right to use the street as the railways had, consistent, of course, with peculiar and essential differences in the means and manner of its use by them and by the railways. Therefore, when the trial court ordered relators not to picket within 100 feet of the spur tracks when the railways were using or about to use them, he was abridging the right of free speech guaranteed them by the Constitution. So, in so far as the injunction judgment entered by the trial court attempted to restrain peaceful picketing at, near, across or within 100 feet of the railway tracks across Pickett Street, it is void; and, since the testimony offered at the contempt hearing failed to show any other sort of picketing, the order of commitment for contempt is likewise void. One cannot be punished for contempt for violating an order which a court has no authority to make. Ex Parte Castro, 115 Texas, 77, 273 S. W., 795; Ex Parte Armstrong, 110 Texas Crim. Rep. 362, 8 S. W. (2d) 674.

Cases decided by our courts of civil appeals relating to picketing, conspiring and boycotting, but which did not reach this court are: The Fair, Inc., et al v. Retail Clerks, etc., Local No.

131, 157 S. W. (2d) 716; Tipton v. Hotel and Restaurant Employees, 149 S. W. (2d) 1028; San Angelo v. Amalgamated Meat Cutters, 139 S. W. (2d) 843. And see Ex Parte Waltrip, 151 Tex. Cr. Rep., 207 S. W. (2d) 872.

Interesting and informative discussions by the highest courts in other jurisdictions of various phases of the questions at bar appear in Ellingsen v. Milk Wagon Drivers' Union, 377 Ill., 76; Kingston Trap Rock Co. et al v. International Laborers' Union et al, 129 N. J. Eq., 570, 19 Atl (2d) 661; Mason and Dixon Lines v. Odom et al, 193 Ga. 471, 18 S. E. (2d) 841; Alliance Auto Serv. v. Cohen et al 341 Pa. 283, 19 Atl. (2d) 152; S and W Fine Foods v. Retail Delivery Drivers 11 Wash. (2d) 262, 118 Pac. (2d) 962; Amer. Fed. Labor v. Bain 165 Or. 183, 106 Pac. (2d) 544, 130 A. L. R. 1278; Ex Parte Hunn 357 Mo. 256, 207 S. W. (2d) 468.

■ Under our holding in Ex Parte Fisher, 146 Texas 328, 206 S. W. (2d) 1000, (Affirmed by Supreme Court of United States ____U.S.____, 69 Sup. Ct. Rep. 425, 93 L. Ed. 435, we are authorized to consider the facts proved in the contempt hearing to determine whether they were sufficient to confer jurisdiction upon the trial court to hold relators in contempt. That examination discloses that they were not so sufficient and that the contempt commitment was, therefore void. Hence our present holding in no way conflicts with Ex Parte Genecov, 143 Texas 476, 186 S. W. (2d) 225, 160 A. L. R. 1099, and other similar cases cited by respondents.

■ Relators insist that the trial court was without jurisdiction to issue the injunction out of which the contempt proceedings arose, because "the Labor Management Relations Act of 1947, 29 U. S. C. A., Sec. 141, vests exclusive jurisdiction in the National Labor Relations Board." Specifically, they argue that the oil company's petition in the injunction suit alleges conspiracy to boycott and actual boycott "which is within the terms of the Labor Management Relations Act." Then they contend that "the Act, far from granting any power to the District Court to enjoin such activities, provides an *exclusive* administrative remedy before the N.L.R.B."

In Bakery Sales Drives Local Union et al. v. Wagshal, 333 U. S. 437, 68 Sup. Ct. 630, 92 L. Ed., 599, the Supreme Court held that the Act in question altered the power of federal courts to issue injunctions against secondary boycotts as that power

existed under the Norris-LaGuardia Act, 29 U. S. C. A., Sec. 101 et seq., only where an injunction is sought by the National Labor Relations Board and not where that proceeding is instituted by a private party.

Several of the decisions of the Supreme Court, which we have cited and discussed and which were written after the Norris-LaGuardia Act became law, expressly recognize the power of the state courts to enjoin labor union activities when those activities constitute violations of valid state statutes enacted in public interest. Notable among these is Milk Drivers Union v. Meadowmoor Dairies, supra, 312 U. S., 287, 61 Sup. Ct., 552, 85 L. Ed., 836, 132 A. L. R. 1200, wherein the union, as a part of its picketing, had resorted to acts of violence which the statutes of Illinois denounced as crimes. In emphatic terms the Supreme Court sustained the power of the Illinois courts to enjoin those acts. "The Constitution is invoked to deny Illinois the power to authorize its courts to prevent the continuance and recurrence of flagrant violence, found after an extended litigation to have occurred under specific circumstances, by the terms of a decree familiar in such cases. Such a decree, arising out of a particular controversy and adjusted to it, raises totally different constitutional problems from those that would be presented by an abstract statute with an overhanging and undefined threat of free utterance. To assimilate the two is to deny to the states their historic freedom to deal with controversies through the concreteness of individual litigation rather than through the abstractions of general law. * * * The Fourteenth Amendment still leaves the state ample discretion in dealing with manifestations of force in the settlement of industrial conflicts. * * * Certainly a state is not confined by the Constitution to narrower limits in fashioning remedies for dealing with industrial disputes than the scope of discretion open to the National Labor Relations Board. * * * To deny to a state the right to a judgment which the National Labor Relations Board has been allowed to make in cognate situations, would indeed be distorting the Fourteenth Amendment with restrictions upon state power which it is not our business to impose."

Boycotting and many other things are condemned by the statutes of this state, and the prohibitions extend to all people of the state. So the circumstance that one may be engaged in a strike will not exempt him from the terms of those statutes when his activities are not within the bounds set by the Fourteenth Amendment. While, for obvious reasons, we cannot here define

and limit the field of state court jurisdiction to grant injunctions against strike activities which offend against the statutes of this state, we do hold that the trial court's jurisdiction to enjoin the defendants, on the complaint of the Greenville Cotton Oil Company and after hearing, from resorting to violence or threats or physical obstruction of the spur tracks or other violations of the law to prevent the railways from entering the mill plant, is in no sense impaired by the Labor Management Relations Act, supra. Those are acts which would be unlawful as against any person within this state, whether engaged in strike activities or not; and they present no conflict of jurisdiction as between state and federal administrative agencies in the field of labor-management disputes, such as was presented in Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U. S., 767, 67 Sup. Ct. 1026, 91 L. Ed., 1234, cited by relators.

It follows from what we have said that relators are illegally restrained, so our order is that they be discharged from custody.

Rehearing overruled December 31, 1948.

Associate Justice Smedley concurs in the result.