## INTERNATIONAL MOLDERS & FOUN-DRY WORKERS' UNION v. TEXAS FOUNDRIES, Inc.

No. 4759.

Court of Civil Appeals of Texas. Beaumont.

May 31, 1951.

Rehearing Denied June 20, 1951.

Second Motion Rehearing Denied July 2, 1951.

Mullinax, Wells & Ball, Dallas, for appellant.

Collins, Garrison, Renfrow & Zeleskey, and Peavy & Shands, all of Lufkin, Rawlings, Sayers, Scurlock & Daly, Ft. Worth, for appellee.

R. L. MURRAY, Justice.

This is an appeal from an order of the district court of Angelina County, granting a temporary injunction in favor of Texas Foundries, Inc., appellee, against the In-

ternational Molders & Foundry Workers Union of North America, its affiliated local union in Angelina County and 38 individuals who were members of either the International Union or the local union.

During the year 1949, at the direction of the National Labor Relations Board, an election was held to determine the bargaining representative for the employees in a certain craft at Texas Foundries, Inc., at Lufkin. There are approximately 450 employees of this concern, 380 of whom are classed as production employees, the others being classed as office employees, administrative and executive personnel. Fifty-eight employees in the craft, known as molders, coremakers, and apprentices, designated the International Molders & Foundry Workers Union of North America, A. F. of L., local union No. 429, as their bargaining agent. None of the other employees of the appellee have designated any person or union as their bargaining agent. A contract covering wages, hours and working conditions of the 58 employees who are members of the craft was entered into between them and their employer, the appellee, on November 11, 1949, which contract expired November 11, 1950. The employer and the union were unable to agree on the terms of a new contract and the union members voted to call a strike upon the vote of 33 of their members. The strike became effective January 9, 1951, and at that time 35 union members went out on strike and established picket lines. Twenty-three members employed in the craft of molders, coremakers and apprentices remained at work. None of the other approximately 400 employees of the appellee engaged in the strike, although a few employees who were not members of the local union did join the strike and remained away from work. Other employees indicated satisfaction with their jobs, wages, hours and conditions of employment.

After the strike began a picket line was established at various entrances at appellee's plant. The persons on strike and those assisting them endeavored to persuade all employees of appellee to leave their employment with the company and to persuade all other persons to refrain from entering the premises for the purpose of doing business with the company. For the first week or so of the strike these activities were confined to argument and requests that employees and other persons not enter the plant or cross the picket lines, and by arguing that the union and its members would thus be aided in obtaining their desired ends. There is no instance of any violence whatever upon the picket lines. There is no evidence of any actual physical violence in any way in connection with this strike. There is some evidence that after the first week or so the efforts by the appellants and those aiding them were extended so as to include vague and indefinite threats of possible harm to those who might continue to cross the picket lines. As a result of these threats some of the employees of the appellee (most of them colored people) remained away from their work until they were furnished escorts at their request by their employer from their homes to their jobs and back again. There is also some evidence that carriers of freight to and from the appellee's plant had some difficulty in getting their trucks in and out of the plant, not through any physical obstruction thereto but by inducing drivers of trucks not to cross the picket lines. The evidence in regard to these acts, both in connection with the employees and truck drivers, will be considered more at length later in this opinion. At the conclusion of the testimony the trial court found that the appellants and each of them "have been guilty of the commission of many unlawful acts in their picketing of Texas Foundries, Inc., and Texas Foundries, Inc., has sustained immediate and irreparable injury, loss and damages as a result thereof unless such defendants, and other persons engaged in active concert or participation with them are restrained and enjoined from the commission of the acts herein set forth."

The trial court's judgment decreed that the appellants, "their officers, agents, servants, employees and attorneys, and all persons who may be, or who may have heretofore been in active concert or participation with them, be restrained and enjoined

from the commission of the following acts: (a) from further picketing the entrance to plaintiff's plant and from further maintaining pickets at and about plaintiff's plant; (b) from any character of interference with the use of the entrance into plaintiff's plant by plaintiff's employees or members of the public who desire to enter said plant; (c) from presenting themselves at or near the premises and place of business aforesaid of plaintiff for the purpose of picketing or exhibiting signs, placards or banners or in any manner interfering with plaintiff's said business; (d) from the commission of any act that will interfere with or cause either the employees or members of the public from entering and freely patronizing plaintiff's place of business; (e) from the commission of any acts of violence or threats of bodily injury to other employees of plaintiff; (f) from the commission of any act or conduct seeking to destroy, impair, or violate the inherent right of any and all of plaintiff's said employees, other than these defendants, to work for plaintiff and to carry out their contract of employment with plaintiff; (g) from the commission of any act or the use of any means, the result of which would be to create a boycott against plaintiff or a 'secondary boycott' against persons who would otherwise carry on business intercourse with plaintiff; (h) from the commission of any act or conduct which would tend for its purpose to induce common carriers of freight to desist and refrain from transporting material into said plant to plaintiff or from said plant of plaintiff to other points in the usual course of business and in the free flow of commerce; (i) from the commission of any act of interference of the free ingress to and egress from plaintiff's premises and plant by employees of plaintiff who desire to work thereat; (j) from the use of insulting, threatening and obscene language toward any of plaintiff's employees who desire to work at said plant for the purpose of interfering with, hindering, obstructing and intimidating said employees who desire to work at said plant and from interfering in any manner with plaintiff's employees in the free exercise of plaintiff for the performance of their lawful vocation as employees of plaintiff; (k) from the commission of any act designed to induce or cause any other employees of plaintiff who desire to work for plaintiff to violate or breach their contract of employment with plaintiff."

The trial court filed lengthy findings of fact and conclusions of law, which extend through 18 pages of the transcript.

█ Appellants' first point is as follows: the district court had no jurisdiction to issue an injunction inasmuch as federal legislation, the Taft-Hartley Act, 29 U.S. C.A. § 141 et seq., has preempted the field and lodged exclusive jurisdiction in the N.L.R.B. and the federal courts. The appellee, the employer, is engaged in interstate commerce and is thus subject to the Taft-Hartley law. The appellants are charged in appellee's petition, and are found by the trial court, with having restrained and coerced employees in the exercise of their right to refrain from joining the union and with having engaged in boycott activity. Each of the matters is comprehensively regulated in the Taft-Hartley law. The appellants argue that since the Federal Congress has legislated extensively in this field any state action in the field is void. They rely upon and quote from the opinion by the United States Supreme Court in International Union of United Auto, etc., Workers Union v. O'Brien, 339 U.S. 454, 70 S.Ct. 781, 783, 94 L.Ed. 978 and Amalgamated Association, etc., v. Wisconsin Employees Relation Board, 27 L.R.R.M. 2418. On the authority of International Brotherhood of Teamsters, etc., v. Missouri Pacific Freight Transfer Co., Tex.Civ.App., 220 S.W.2d 219, by this court, and Ex parte Henry, 147 Tex. 315, 215 S.W.2d 588 by the Supreme Court of Texas, we overrule this contention by the appellants. It is said in the Automobile Workers Union v. O'Brien case, supra, that certain portions of the Taft-Hartley Act cannot be "read as permitting concurrent state regulation of peaceful strikes for higher wages. Congress [has] occupied this field and

216

closed it to state regulation." [339 U.S. 454, 70 S.Ct. 783.] It is pointed out in the case of Ex parte Henry, supra, that the court's jurisdiction to enjoin people after a hearing from resorting to violence or threats of physical obstruction or other violations of the law is in no sense impaired by the Labor Management Relations Act; that those are acts which would be unlawful as against any person within this state, whether engaged in strike activities or not. We do not think the trial court here was without authority to issue an injunction, since violence in connection with the strike was alleged.

■ The appellants' second point is: "Employer-respondent, having failed to exhaust administrative and judicial remedies available before N.L.R.B. and the federal courts, has no right to injunction." The appellants argue that in the case at bar employer has a plain, adequate and speedy remedy under the Taft-Hartley Act before the N.L.R.B. and the federal courts; that since it had a plain and adequate remedy it should not have been granted an injunction until it had exhausted such legal remedy and this it has not done. It also argues that the employer also has available to it the protection of competent peace officers of both the city and county where its plant is located. We overrule this point. We do not believe that the National Labor Management Relations Act of 1947, commonly known as the Taft-Hartley Act, attempts to regulate all of the various acts of the union here enjoined by the trial court. Certain provisions of Section 8(b) of that act do define certain acts on the part of the labor union which are declared to be unlawful and which are prohibited by that act. But the contention of the appellee here is that the union, its members and those acting in concert with them, have been found by the court to have conspired to commit acts and offenses other than those which are defined and prohibited by the Taft-Hartley Act; that the trial court found that the appellant union, its members and those acting in concert with them, have conspired to force employees of the appellee to cease their employment with the foundry, and

in pursuit of this conspiracy have accosted its employees in the vicinity of its plant and at points far removed therefrom and have threatened these employees with physical violence if such employees persist in working for the appellee. It is evident to us that under the authority of the cases of Ex parte Henry and International Brotherhood v. Missouri Pac. etc., both cited above under appellants' first point, the jurisdiction of the state courts to act in a case in which violence has taken place or has been threatened, has not been usurped by any act of the Federal Congress and that no administrative remedies were available to the appellee before the N.L.R.B. and the federal courts to prevent threatened violence during the strike.

The other eight points of the appellants are that (3) the injunction deprived them of constitutionally guaranteed rights of free speech and assembly; (4) the trial court erred in holding the appellant union responsible for the unauthorized acts of its members; (5) the trial court erred in holding defendants responsible for the unauthorized acts of unidentified and anonymous persons; (6) the trial court's fact findings are not supported by competent evidence and are contrary to the great weight of the evidence; (7) the trial court erred in holding that there was any evidence or sufficient evidence to support the court's finding that future picketing would probably result in physical violence; (8) the trial court erred in enjoining all picketing on a finding that actual physical violence probably would result; (9) there is no evidence to support a presumed finding of the trial court that the "unlawful conduct" is so enmeshed with the peaceful picketing as to warrant the injunction against all picketing; (10) the trial court's conclusions of law have no support in the record. We will consider all of these points together. They involve a determination of all the basic factors of this controversy, which must be decided by a consideration of all the points themselves and in their relation to each other and to the whole controversy.

We have reviewed the evidence supporting the trial court's findings of many in-

stances of threatened violence. We have read the entire statement of facts. The evidence supports the findings of the trial court that one of the purposes of establishing pickets at the entrances of appellee's plant was to induce others not to enter the premises, either for the purpose of working for the appellee or for the purpose of patronizing appellee, and for observing such persons as would enter the premises; that one of the purposes was to obtain an agreement from appellee to the provisions of a contract covering wages, hours and working conditions of employment submitted by and acceptable to the union; that one of the purposes was to compel all production employees of appellee to become members of the union; that in addition to posting persons at the entrances to the plant of appellee, members of the appellant union congregated in large numbers in view of the various entrances of the plant but across a public street from the plant; that the appellant union and persons acting with them continued the picketing of the premises of appellee constantly from the time the picketing began until all picketing was prohibited by the restraining order of the trial court, which prohibition was continued by the temporary injunction from which this appeal is made; that during the period of time that the picketing was in progress, some 31 incidents found by the trial court under its fact finding No. 12 did occur. From these findings and the evidence supporting them it is evident that the members of the appellant union and those acting with them followed different workmen on their way home from work and after first requesting them not to cross the picket lines, made vague and indefinite threats of violence to them. In particular, the Negro workers were told that it would be dangerous for any Negro to enter the premises of appellee, that if they did continue to cross the picket lines the union members and leaders had no control over 1700 other union members and could not be responsible for what might happen to them; a Negro employee was visited at his home at 9:30 P.M. by three unidentified white men and cautioned him that workmen crossing picket lines in other

strikes had been hurt and if he continued to do so he might be hurt. Another was told that there was going to be some trouble and he should not go into the plant to work; others were told that if things here kept on going somebody would likely get hurt; others were told that if the strike went on further that things were going to get rough and that the union was going to have men from other sections of the state to come up to Lufkin and help them; others were told that they would be sorry if they went back to work and were called opprobrious names; another Negro was told that there was a big black snake loose in the Negro quarters and nobody knew where it would strike next. Because of these threats of violence many of the Negro workers refused to go back to work until escorts were provided for them by the appellee. Many of these conversations and threats took place at places away from the plant itself and some occurred at or near the homes of the workers. Some of them occurred in the late hours of the night.

It is well settled under the decisions of the Supreme Court of the United States and the Supreme Court of Texas that peaceful picketing in connection with a bona fide dispute is a constitutional right which no court should enjoin. Carlson v. People of State of Calif., 310 U.S 106, 60 S.Ct. 746, 84 L.Ed. 1104; Thornhill v. State of Alabama, 310 U.S, 88, 60 S.Ct. 736, 84 L.Ed. 1093; Ex parte Henry, 147 Tex. 315, 215 S.W.2d 588. It is also well established that if violence occurs in the course of a strike and that the picketing is so enmeshed with violence as to become a part of it the state courts may enjoin all picketing. Milkwagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836; International Ass'n of Carpenters and Joiners v. Sharp, Tex.Civ.App., 202 S.W.2d 506. In the case of Cafeteria Employees v. Angelos, 320 U.S. 293, 64 S.Ct. 126, 127, 88 L.Ed. 58, the Supreme Court of The United States dissolved an injunction which prohibited all picketing, and held that the principle announced in the Meadowmoor case extends only to abuses not episodic and

isolated but to acts of violence which are of the very texture and process of the enjoined picketing. In that opinion it was held "'that the power to deny what otherwise would be lawful picketing derives from the power of the states to prevent further coercion. Right to free speech in the future cannot be forfeited because of disassociated acts of past violence.' * * * Still less can the right to picket itself be taken away merely because there may have been isolated incidents of abuse falling far short of violence occurring in the course of that picketing." Applying these basic rules to the present controversy, the trial court's broad injunction against all picketing can be sustained only if its finding and conclusion is correct .that unless all forms of picketing be enjoined, future picketing would probably result in physical violence. The acts of appellants and those acting with them making such threats to the employees of the appellee who wanted to continue their work was unlawful and cannot be excused, but we do not believe that it reasonably follows that even though all such unlawful acts of conduct be enjoined, that a peaceful picketing of the entrances of the appellee's plant, in such a manner as is guaranteed by law to strikers in a bona fide labor dispute, would result in future violence. There has been no violence at or near the picket lines during the whole time picketing continued. There is no evidence in the record that any of the various threatened acts of violence were actually about to take place. It is true that the Negro employees of the appellee apparently believed these threats were genuine, but there is no suggestion of evidence that the appellants and those acting with them were about to put them into effect or would do so if peaceful picketing were permitted. We believe that the rights of all parties to this controversy will be best preserved and protected by the modification of the order of temporary injunction, so as to . allow the appellants to advertise to the world the fact that they are on strike against the appellee by picketing performed in the manner prescribed by the laws of our state, but continuing in effect the trial court's injunction against following employees and other people away from the plant and making threats of future violence against them in case they cross the picket lines.

The trial court, in its findings 12z through 12ee, found that a driver for a fuel oil company, while the picketing was in progress, attempted to drive his truck into appellee's premises and one of the pickets motioned to him to stop; he stopped and the International representative of the union and one of the appellants advised the driver not to enter the premises, that he intended to stop all trucks from crossing the picket lines, that if truck drivers persisted in crossing the picket lines he would not be responsible if someone got their heads half knocked off; that while the picketing was in progress, after the union truck drivers of Red Ball Motor Freight Line a common carrier which daily served the appellee, refused to cross the picket lines, the local manager for that concern drove the trucks in and out of the plant himself; that on one occasion when he was about to cross the picket line the International representative of the union asked him not to cross the picket line and further informed him that he could not keep him from crossing the line but that he could not promise him what would happen to him when he came out of the plant; that later this same driver of the truck, the local manager of the freight line, was again followed to his home by several men in a car, one of whom again asked him to refrain from crossing the picket lines; on another occasion several identified men drove to the terminal of the motor freight line and asked the manager to prohibit all trucks operated by Red Ball Motor Freight in serving the appellee. This he did not do. On another occasion the International representative of the union went to the terminal of this same motor freight line at Lufkin and there asked the dock foreman not to permit that concern to cross the picket lines; in that conversation he informed the dock foreman that he knew who had driven the truck across the picket lines and where the person lived and that the person who did so

might slip on a banana peel if he was not careful. The appellants argue that these conversations over the use of the plant entrances by the Red Ball Motor Freight Line trucks indicates only a privileged attempt to persuade the local manager to honor their picket lines. The manager, who drove the truck into the plant, testified as to this conversation with the union representative and further testified that he went into the plant that afternoon, and had been continuing to serve the Texas Foundries with the same type of service all during the strike that they had prior to the strike, except that the appellee had to furnish help for loading purposes. From the evidence in regard to these findings it is apparent that there has been no hindrance of the movement of freight by truck in and out of appellee's plant by the conversations and arguments with the truck line officials.

The decree of the trial court is modified so that the appellants, their officers, agents, servants, employees and attorneys, and all persons who may be or may have heretofore been in active concert with them be restrained and enjoined from the commission of the following acts: (a) from any physical interference with the use of the entrances to appellee's plant by its employees or members of the public who desire to enter such plant; (b) from the commission of any acts of violence or threats, direct or indircet, of bodily injury to other employees of the appellee or any other persons entering or seeking to enter appellee's plant; (c) from commission of any act or conduct seeking to destroy, impair, or violate the inherent right of any or all of appellee's employees, other than the appellants, from working for the appellee and carrying out their contract of employment with it; (d) from the commission of any act or conduct which would tend for its purpose to induce common carriers of freight to desist and refrain from transporting freight into said plant or from said plant in the usual course of business; (e) from the use of insulting threats and obscene language toward any of appellee's employees who desire to work at said plant, for the purpose of interfering with, hindering or intimidating such employees who desire to work. All those portions of the temporary injunction granted by the trial court which enjoined appellants from picketing of appellee's plant are dissolved.

The decree of the district court is modified and as modified is affirmed.

### On Motion for Rehearing.

In their motion for rehearing the appellants attack our finding that the "evidence supports the finding of the trial court that one of the purposes of establishing pickets at the entrances of appellee's plant * * * was to compel all production employees of appellee to become members of the union." We have re-examined the evidence and the briefs of both parties and have concluded that we were in error in making this finding. The evidence does not support the finding of the trial court quoted. It does show that one of the purposes of the union in establishing picket lines was to obtain an agreement on the part of the employer that the union might act as bargaining agent for all of the employees in the production department of the company, that is, to compel the company to recognize it as the exclusive bargaining agent for all production employees of the foundry.

The other matters presented in the appellants' motion have also been considered and we believe they present no error.

Appellants' motion that the injunction of the trial court as modified by this court be vacated and dissolved is overruled.