INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL NO. 745, et al. v. BEST MOTOR LINES.

No. 5980.

Court of Civil Appeals of Texas. Amarillo.
Feb. 13, 1950.

Rehearing Denied April 24, 1950.

Mullinax, Wells & Ball, Dallas, for appellants.

Rawlings, Sayers & Scurlock, Fort Worth, for appellee.

Singleton, Trulove & Edwards, Amarillo, Phinney, Hallman, Reed & Holley, Dallas, amici curiæ.

LUMPKIN, Justice.

This is an appeal from a temporary injunction issued by the 44th District Court of Dallas County, Texas. The suit was filed by the appellee, Best Motor Lines, against the appellants, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 745, A.F. of L.; four union officials; and seven of appellee's employees, George Prda, George Franklin, J. C. Crouch, D. J. Green, Alma Davenport, Audra Torrance and Betty Ruth Messenger. The suit also named as defendants several motor carriers. The purpose of the suit was to enjoin the appellants from picketing appellee's Dallas terminal and to recover damages. Defendant Green and the five defendant motor carriers failed to file answers. They are not parties to this appeal.

The appellee maintains its general office at Dallas. It is a common carrier of freight engaged in both intrastate and interstate commerce. Its entire office force at Dallas consisted of abount twenty-five persons who worked as clerks, stenographers and machine operators. Only seven persons, however, comprised the clerical force of appellee's Dallas office. At the time this controversy arose, the appellee had a contract with the appellant union covering its city drivers, truck drivers, dockmen and helpers, checkers and extra men in the same classification; but the contract did not include the clerical workers in either the general or the local offices. It was stipulated in the contract that it would not be considered a violation of the agreement for an employee to refuse to cross a legal picket line.

On December 17, 1948, Betty Ruth Messenger and Audra Torrance, two of the women employed by appellee at the Dallas office, invited five of their fellow employees to a meeting at their apartment. Several union representatives were present. Union applications and authorization blanks were distributed, and a sample contract was read and discussed. The wages paid under the proposed contract were higher than those paid by the appellee to its office employees. While it appears that appellee's officials had received reports concerning efforts being made to organize the office employees, they had received no information as to how the various employees had voted on the question of authorizing the union to represent them. No complaint as to wages or working condi-

tions had been made to the appellee by any of the clerks. However, on Christmas Eve, 1948, Guthrie, appellee's local agent, asked the seven employees not to join the union, and on December 30 he discharged the two women who had called the meeting at their apartment. A third woman employee was also discharged. Inefficiency was the reason given for terminating the employment of the three women.

On the following day, December 31, two of the union officials met with Frank Weber, appellee's general manager, and asked that the three women be reinstated and requested that appellee sign a contract, which the union representatives produced, with appellant union, recognizing it as the exclusive bargaining agent of the local office employees. It appears that the union representatives had written applications for membership from six of the seven employees. On the grounds that the appellant union had not been certified by the National Labor Relations Board as the bargaining agent for the local office employees, the general manager challenged the authority of the union and refused to reinstate the three women.

Thereafter, on January 3, 1949, without the knowledge of any of the employees other than Betty Messenger and Audra Torrance, a picket line was established about the appellee's premises. However, when they learned about the picket line, five of the employees at the office assisted in maintaining it. The signs carried by the pickets stated that appellee had discharged three of its employees. According to the testimony of appellants Franklin, Messenger, Torrance and Crouch the purpose of the strike and the picket line was to secure recognition for the union as their bargaining agent and through the efforts of their agent to secure better wages and working conditions.

On Jaunary 31, the appellee informed the three discharged employees that it was willing to reinstate them and to pay them their wages for the time lost. Two of the three women did return to work after this suit was filed. The picket line, however, was not removed, but the placards carried by the pickets were changed to read: "Lo-cal office employees of Best Motor Line, through Local No. 745, are asking for an increase and better working conditions." The appellee's representatives met with union officials and requested that the picket line be removed until such time as the NLRB could determine what group of employees would constitute the appropriate bargaining unit. The union declined, and on February 5, 1949, this suit was filed.

A hearing was had before the court without a jury. The statement of facts totals 1,064 pages. The first 1,019 pages contain the appellee's case. In its order granting the temporary injunction, the court made elaborate findings of facts and conclusions of law.

The court found that a "labor dispute," as defined by Article 5154f, Sec. 2, par. h, Vernon's Ann.Civ.St., did not exist between the appellee and its office employees; that after the picket line was established, all of appellee's line drivers, city drivers and dock workers "ceased work and refused to perform any service across or behind said picket line. Some four or five automobiles belonging to Local 745 and other defendants were stationed and parked at or near the entrance of plaintiff's premises near the sidewalk and against the curb where the picket line was being maintained and operated and when the weather would not permit the pickets to carry the banners and signs, the same would be placed in, on or about said automobiles in such manner as that they would be plainly visible to anyone desiring or attempting to enter plaintiff's premises and the pickets would in large numbers, together with other Union members congregate in said cars and discuss the strike and picket line, among other things. * * *

"The picket banners were physically carried by defendants Franklin, Crouch, Davenport, Torrance and Messenger from the clerical force. Other members of the Union who were employees of the Company occasionally walked alongside of the persons carrying the picket banner and sign, but did not physically handle same. * * * On one occasion, while the picket line was being operated and the banners displayed, while three men were sitting

in the front seat of an automobile owned by Local 745 near the entrance of plaintiff's premises, the witness Springer testified that one of them displayed a deadly weapon, a pistol, by exhibiting it with his hands and twirling same, as the witness said, 'in Western style.' During the time this pistol was being publicly displayed by the man in the car * * * one of the picket signs and banners was connected with and attached to said automobile in which the men were seated, plainly visible to persons approaching said entrance. D. J. Green, one of the clerks who signed an authorization card to the Union, was requested to join in the picketing, which he refused to do. * * *"

The court found that appellant Union had not been certified by the N.L.R.B. as the duly authorized bargaining agent of appellee's clerical force; that "on December 31, 1948, a proposed contract covering seven clerical employees was first presented to plaintiff's general manager by the Union * * *; (that on) February 3, 1949, defendant Dixon (a union official) definitely stated to Frank Weber and other company officials present that the Union would not remove the picket line, but would continue to picket the premises unless the Company recognized Local 745 as the bargaining agent of the seven members of the clerical force and increase their wages twenty-five percent." The line drivers, city drivers and dock workers, all of whom were members of the union, and the Motor Carrier defendants, whose drivers were also members of the union, refused to handle the company's freight. Their contracts provided that the employees could refuse to cross a picket line and that the employer would "not request, instruct or require such employees to go through a picket line of a striking union." The union learned that a connecting carrier, Keystone Freight Lines, was transporting some of the appellee's freight; so, the union officials, Stewart and Vestal, informed the manager of this carrier that it was handling "hot" freight. Keystone Freight Lines immediately discontinued transporting freight for appellee because it understood that if the Keystone drivers were requested to trans-

port the freight, then a strike would be called against Keystone.

The appellee was unable to interchange freight with the connecting line carriers. The Motor Carrier defendants ceased doing business with appellee notwithstanding the interchange contracts and joint rate agreements which the company had with them. The appellee's loss was approximately $20,000.

The trial court concluded that the establishment and maintenance of this picket line was a burden on commerce, a violation of the Anti-Trust Laws of Texas, Vernon's Ann.Civ.St. art. 7426 et seq., and a violation of Articles 884 and 6360, Vernon's Annotated Civil Statutes. The court also concluded that the picketing was not peaceful, that it was accompanied by threatening and coercive conduct and that the contract which the union officials demanded was a violation of the Anti-Closed Shop Statute, Article 5207a, Vernon's Annotated Civil Statutes.

To this judgment the appellants excepted and in due time perfected their appeal to the Court of Civil Appeals for the Fifth Supreme Judicial District, whence it was transferred to this court by order of the Supreme Court of Texas.

In reviewing this case we shall first determine whether the facts constitute a "labor dispute" as that term has been defined by our courts; second, whether the picketing was carried on in a peaceful manner; and third, whether the picket line was established for a lawful purpose.

The order granting the temporary injunction was entered March 5, 1949. Since that time the Supreme Court of Texas has handed down several opinions clarifying the law in cases of this nature. In the case of International Union of Operating Engineers, Local No. 564, v. Cox, 219 S.W.2d 787, the Supreme Court held unconstitutional that portion of Article 5154f, Sec. 2, par. h, Vernon's Annotated Civil Statutes, which restricted a labor dispute to a controversy between an employer and a majority of his employees. In the case of Construction & General Labor Union, Local No. 688 v. H. I. Stephenson, Tex.

Sup., 225 S.W.2d 958, the court broadened the term "labor dispute" as used in Article 5154f. The court held paragraph h of this statute to be in conflict with the Fourteenth Amendment as construed by the Supreme Court of the United States in American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855, and in Cafeteria Employees Union, Local 302 v. Angelos, 320 U.S. 293, 64 S.Ct. 126, 88 L. Ed. 58. In the Stephenson case, the Texas Supreme Court said [225 S.W.2d 961]: "In the Swing case the Supreme Court held, and repeated in the Angelos case, that 'a state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him.' 312 U.S. at page 326, 61 S.Ct. 568, 570, 85 L.Ed. 855; 320 U.S. at page 296, 64 S.Ct. 126, 88 L.Ed. 58."

In Ex parte Henry, 147 Tex. 315, 215 S.W.2d 588, the Texas court recites the settled rule that picketing is one form of the exercise of the constitutional right of freedom of speech. But in other opinions the court was careful to point out that picketing, to be lawful, must arise from an industrial dispute, International Union of Operating Engineers v. Cox, supra, and must not be carried on for purposes in violation of a valid statute. North East Texas Motor Lines v. Dickson, Tex.Sup., 219 S.W.2d 795; Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834.

The appellants point out that appellee's general office and its local office at Dallas are separate and distinct from each other, and this fact is apparent from the testimony most favorable to the appellee. The two offices are under separate supervision; each has its own accounting system. Seven persons, including the six named as appellants, constituted the entire clerical force of appellee's local office. The union made no attempt to organize the eighteen employees of the general office force, nor did it pretend to represent them. The five employees of the local office who took part in the establishment and maintenance of the picket line constituted a majority of the clerks in the local office as contemplated by Article 5154f, § 2, par. h. Alamo Express, Inc. v. International Brotherhood of Teamsters, Tex.Civ.App., 215 S.W.2d 936. However, according to the view expressed by the Supreme Court in the case of International Union of Operating Engineers v. Cox, supra, whether a majority of the employees were engaged in the controversy is not a factor in determining what constitutes a "labor dispute." As expressed in the Cox case, that portion of the statute which restricts a "labor dispute" to a controversy between an employer and a majority of his employees is declared a violation of the constitutional guarantee of free speech.

Article 5154f, Sec. 2, par. h, as modified by the Cox case and as broadened by the Stephenson case, and Article 1621b, Sec. 3, Vernon's Annotated Penal Code, define a "labor dispute" as a controversy between an employer and his employees concerning the terms or conditions of employment or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment. 31 Am. Jur. 1015. It has been held that the term "labor dispute" must be broadly and liberally construed but that the interpretation must be reasonable. United Electric Coal Co. v. Rice, 7 Cir., 80 F.2d 1; Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, D.C., 41 F.Supp. 727. The trial court failed to make a finding as to the purpose for which the appellants established the picket line. However, it appears that the union officials made their initial call upon appellee's general manager for two purposes: (a) to secure the reinstatement of the three women and (b) to prevail upon the appellee to sign a contract recognizing the appellant union as the exclusive bargaining agent for the seven persons employed in appellee's local office. Later, as was indicated by appellants' second placard, the controversy between appellants and appellee concerned wages, hours and working conditions. Thus, while we indulge every presumption in favor of the trial court's

finding, a review of this record clearly discloses the existence of a "labor dispute" between the appellee and several of its employees. In our opinion the trial court erred in finding to the contrary.

■ The appellee challenges the validity of the picket line on the grounds that the union seeking recognition had not been certified as appellants' bargaining agent by the National Labor Relations Board. Although an employer cannot be required to devote his time to negotiating with every individual claiming to represent a bargaining unit, in this case the evidence shows that Weber, appellee's general manager, was well acquainted with Jimmie Stewart and Don Vestal, two union officials and the men who, on December 31, 1948, paid the initial visit to appellee. In his testimony, the witness Weber refers to these two union officials by their first names. On that occasion, the general manager challenged the authority of the union and refused to reinstate the three women or to sign or to negotiate a contract. He informed the union officials that the appellee would want an election and certification conducted by the N.L.R.B. and that if the appellant union was certified by N.L.R.B. the appellee would negotiate with it. In this case Weber knew the union officials, knew the purpose of their visit, and was given an opportunity to learn the terms of the proffered contract and to negotiate with respect thereto. Also Weber was told that the union officials had signed applications from six of the seven persons employed in the local office, and he had an opportunity to investigate the truth of the officials' statements. In these two respects this case may be distinguished from that of North East Texas Motor Lines v. Dixon, supra, in which it was held that there can be no bargaining without some character of demand and that in the absence of some request by employees or their representatives, an employer is not guilty of an unfair labor practice in refusing to bargain. In the case of Douds v. Local 1250, Retail Wholesale Department Store Union of America, C.I.O., 173 F.2d 764, the United States Court of Appeals, Second Circuit, held that it was not an "unfair labor practice" for the agents of a union, which was not certified as a collective bargaining representative, to induce other employees to strike to compel an employer to reinstate former employees. The Circuit Court also held that employees may choose whom they will to represent them in bargaining, so long as their grievance has not already been adjusted by a certified agent. So far as it appears in the instant case, no collective agreement had been made between the appellee and appellant union concerning the seven persons employed in the Dallas office, and there is nothing to show that an agent to act for these employees had ever been certified by the N.L.R.B.

■ Next, we must determine whether the picketing was carried on in a peaceful manner. The court found as follows: "The manner in which said picket line was maintained as well as the conduct of those carrying the picket signs and those congregating at and near the picket line * * * was threatening and coercive as to those having business with the Company and seeking to enter its premises." We cannot agree with the trial court in this finding. The appellee admits that this is not a case involving mass picketing, nor is there any testimony showing that any member of the picket line obstructed any ingress or egress from appellee's truck terminal.

On the issue of violence, we briefly refer to three incidents. The first incident concerns one D. J. Green, one of the employees who signed an authorization blank at the gathering held in Betty Ruth Messenger's apartment on December 17, 1948. On the day the strike was called, Green, having heard of the establishment of the picket line before he left his home for work, telephoned the appellee that he was sick and would be unable to work that day. The following afternoon he visited the appellee's place of business, talked with his fellow workmen who were maintaining the picket line, crossed the picket line and entered appellee's office. Several days later he went to Shelby County, Texas. According to his testimony, Green was never intimidated or coerced by the picketers. His

918

father was sick in Shelby County, and he obtained from appellee a leave of absence to visit him.

The second incident purportedly involving violence concerns the presence of a pistol near the picket line. The pistol is before us. Although it bears the semblance of a revolver and at a distance could easily appear to be a firearm, the alleged pistol is obviously a toy. It belongs to one of the appellants' children and had been left in one of the automobiles the appellants were using as a shelter while not walking the picket line. The witness Springer stated he saw three men seated in the automobile. One of the men was twirling the toy pistol in "Western style." The pistol was not pointed at Springer in an angry or threatening manner, nor was he intimidated by its presence. The evidence fails to show that either Springer or any one else was prevented from entering the appellee's place of business by reason of this toy. The record does not disclose that any criminal charge was filed against any one because of the toy pistol, and there is no evidence that a deadly weapon was ever exhibited near the picket line in an angry or threatening manner or with the intent to alarm any one. Pearce v. State, 37 Tex.Cr.R. 643, 40 S.W. 806.

The third incident complained of by the appellee relates to a purported conversation between a third person and the picket Cox, who is alleged to have spoken in a threatening manner. According to Green's testimony, one Cox, who had been employed by the appellant union to assist in maintaining the picket line, boasted to either Betty Messenger or Audra Torrance that he didn't know how many folks he had put in sacks of cement and tossed in the river for going through a picket line. The record does not reveal that any one was intimidated or coerced by the purported statement made by Cox. There is nothing which connects his purported threat with the labor dispute between the appellants and the appellee. Certainly Cox's remarks did not deter the witness Green from crossing the picket line, and since Green is repeating what some one told him, the evidence is probably hearsay and not admissi-

ble. Since the record fails to disclose that any one was intimidated or coerced by any of the foregoing incidents or that any public thoroughfare was obstructed, in our opinion the court erred in finding that the picketing was not peaceful. Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, 312 U.S. 287, 61 S. Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200; 31 Am.Jur. 1001, Sec. 340.

We have determined that a labor dispute did exist between the appellants and the appellee and that the picketing was peaceful. We must now ascertain if the picketing was for a lawful purpose. The appellee contends that the appellants' acts constitute a violation of the Anti-Trust Laws of Texas and a violation of Articles 884 and 6360, Vernon's Annotated Civil Statutes. In the case of Ex parte Henry, supra, the Supreme Court of this state had a similar question before it. In that case the court observed that since peaceful picketing is lawful and is protected by the First and Fourteenth Amendments to the Constitution of the United States, conduct which amounts to no more than peaceful picketing can in no sense be regarded as violating the Anti-Trust Laws of this state. The court said: "So long as the fundamental law guarantees the right of a citizen to do a given act, that act cannot be effectually condemned either by statute or by judicial decree." [147 Tex. 315, 215 S.W. 2d 595].

As we understand the evidence, none of the defendant carriers refused to accept and transport freight tendered them by the appellee. Such conduct does not constitute a violation of Articles 884 and 6360.

The appellee complains that since the employees of the Motor Carrier defendants did not cross the picket lines manned by the appellants, the picketing and the consequent refusal of the truck employees to cross the picket line constituted such concerted action between the appellants and the employees of other truck lines as to amount to secondary picketing, boycotting and a conspiracy in restraint of trade. An identical charge was discussed in the Henry case, wherein the court declared: "Under

the decisions of the Supreme Court * * * picketing does not offend against the statutes merely because third parties who come to the area of the dispute may prove sympathetic to one disputant rather than to the other." International Brotherhood of Teamsters v. Missouri Pacific Freight Transport Co., Tex.Civ.App., 220 S.W.2d 219, at page 252, writ ref. n. r. e.

The appellee asserts that the purpose of appellants' picket line was to compel the appellee to sign a contract in violation of Article 5207a, which reads in part as follows: "Sec. 3. Any contract which requires or prescribes that employees or applicants for employment in order to work for an employer shall or shall not be or remain members of a labor union, shall be null and void and against public policy. The provisions of this Section shall not apply to any contract or contracts heretofore executed but shall apply to any renewal or extension of any existing contract and to any new agreement or contract executed after the effective date of this Act."

■ The trial court concluded that the contract which the union officials demanded was in violation of the statute because it provided that appellee would hire only "those men referred to them by the union if they were available; however, if the union does not have suitable men available, a non-member may be hired." This excerpt quoted in the court's findings is the only part of the proposed contract in the record. A printed form entitled "Articles of Agreement" is among the exhibits. The form, however, does not contain the names of any of the parties to this appeal. According to the appellee's pleadings, the immediate purpose of the picketing was to compel the appellee to recognize the appellant union as the bargaining agent for seven of its clerks and to increase by twenty-five percent the current wages of those employed as clerks in its Dallas terminal. Appellee's refusal to recognize the appellant union as a bargaining unit was based on the fact that the union had not been certified by the N.L.R.B. as the bargaining agent for the seven clerks. The appellee did not specifically plead a violation of Article 5207a. The object of the picketing, as demonstrated by appellants' placard, was, originally, to gain recognition for their union and to have the three women reinstated, and, later, to improve the wages and working conditions of those employed in the local office. The purpose of the picketing was not to force the appellee to sign a particular contract containing specific stipulations. The proffered contract, which appellee's general manager did not examine, was little more than an invitation to bargain, and the clause which would restrict employment to union members was offered only for a basis of negotiation.

■ From what we have said, it follows that the picketing was lawful and should not have been enjoined. Since the damages alleged by the appellee resulted from the exercise of lawful and constitutionally guaranteed rights, they are damnum absque injuria, as is insisted by the appellants in their brief. Therefore, the judgment of the trial court is reversed, and the temporary injunction awarded therein is dissolved.

On Rehearing

PER CURIAM.

On motion for rehearing the appellee asserts that the following holding of this court is contrary to the trial court's findings: "The trial court failed to make a finding as to the purpose for which the appellants established the picket line." The appellee is correct in this assertion and therefore this portion of our opinion is withdrawn. The five defendant motor carriers are not parties to this appeal. Our order reversing the trial court's judgment is not intended to dissolve the trial court's injunction in so far as it applies to the defendant motor carriers; otherwise, the motion for rehearing is overruled.