BEST MOTOR LINES V. INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND
HELPERS OF AMERICA, LOCAL NO. 745, ET AL.

No. A-2739. Decided February 21, 1951.
Rehearing overruled April 11, 1951.
(237 S. W., 2d Series, 589.)

*Rawlings, Sayers, Scurlock & Daly,* of Fort Worth, for petitioner.

The Court of Civil Appeals erred inholding that the conduct on the part of respondents and certain motor carriers who were defendants in the trial court did not constitute a violation of the antitrust statutes of Texas. Webb v. Cooks,' Waiters, etc., Union, 205 S. W. 465; Borden Co. v. Local No. 133 of Teamsters, etc., 152 S.W. 2d 828; Turner v. Zanes, 206 S.W. 2d 144.

*Mullinax, Wells & Ball* and *L.N.D. Wells, Jr.,* of Dallas, for respondents.

MR. JUSTICE SMITH delivered the opinion of the Court.

In this suit, filed by petitioner, Best Motor Lines, a temporary injunction was issued in the trial court, after a hearing without a jury, against International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No.

745; four of its officials and representatives, to-wit: M. R. Dixon, M. W. Miller, J. C. Stewart and Don Vestal; certain individual employees of the plaintiff, to-wit: George Prda, George Franklin, J. C. Crouch, D. J. Green, Alma Davenport, Audra Torrance and Betty Ruth Messenger; and five truck lines; namely, Keystone Freight Lines, D. C. Hall Transport, Inc., Southern Express, Inc., Yellow Transit Company and Sunset Motor Lines, which had been doing business with the plaintiff.

The Union, its officers and representatives and six of the employees of the plaintiff appealed to the Court of Civil Appeals, Fifth District, at Dallas. Upon order of the Supreme Court, this cause was transferred to the Court of Civil Appeals, Seventh District Amarillo, Texas. That court reversed the judgment of the trial court and dissolved the temporary injunction. However, on motion for rehearing the Court of Civil Appeals expressly stated that the temporary injunction was not dissolved in so far as it applied to the defendant truck lines. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 745, et al v. Best Motor Lines, 229 S.W. 2d 912.

Defendant D. J. Green, one of the employees of plaintiff, and the five truck lines did not appeal; therefore, no notice will be taken in this opinion of the injunction in so far as it affects them.

It was stipulated in the trial that Best Motor Lines was and is a Texas corporation with its principal office in Dallas, Dallas County, Texas; that it is a common carrier of freight engaged in both interstate and intrastate commerce. It is further established that it operates from, to and between the cities of Dallas, in Texas; Tulsa, Oklahoma, in Oklahoma; St. Louis, Missouri; Chicago, Illinois; Akron, Ohio; Cleveland, Ohio and many intermediate points.

The defendant truck lines are also common carriers of freight engaged in both interstate and intrastate commerce. Plaintiff, Best Motor Lines, had labor contracts with the defendant Local Union No. 745 covering its city pick-up and delivery drivers, dock workers and line drivers.

It was further stipulated that Best Motor Lines had never had any labor contract, or contracts, with Local No. 745, or

any other labor organization, covering the clerks or clerical workers.

It was further stipulated that neither Local 745 nor any of the other Union defendants had ever been certified by the National Labor Relations Board as the exclusive bargaining agent under Section 9 or any other section of the Labor Management Relations Act, or its predecessor act, nor had such local been certified by any of the terms or sections of said Act or its predecessor as the exclusive bargaining agent for the clerks or clerical workers, nor had said local ever been certified as exclusive bargaining agent of or for the line drivers of plaintiff, or the city pick-up and delivery drivers, and dock workers of plaintiff.

Each of the defendant truck lines had a contract with respondent, Local No. 745, similar in nature to the contract between Best Motor Lines and said Local No. 745 covering the same class of employees and each of the contracts, including that between the Union and Best Motor Lines, provided that the carrier *"did not request, instruct or require (their) employees to go through a picket line of a striking union."* (Emphasis ours.)

Best Motor Lines and the truck line defendants, all being engaged in the transportation of commodities generally for hire, by express contract agreed to transfer, exchange and interline freight one with the other to points in Texas and other states not being served by the carrier exchanging or interlining said freight.

Prior to the establishment and maintenance of the picket line at petitioner's place of business, all of the said motor carriers had observed and respected said interline regulations and agreements and had interlined and exchanged freight one with the other.

The respondents claim that the facts in this case show that the conduct and actions of all of the defendants and the labor union and the employee defendants were in keeping with the contract and agreement that no employee would be required or requested to go through a picket line of a striking union and that there existed a valid labor dispute, and the picketing being peaceful, there was no violation of the Anti-Trust laws, and therefore, the injunction should not have been granted in the first instance by the trial court, and that the Court of Civil

Appeals was correct in dissolving the injunction. The Court of Civil Appeals held that the evidence introduced by the petitioner in the trial court failed to show a violation of the Anti-Trust laws, or of any of the statutes as found by the trial court. Therefore, it becomes necessary for us to examine the pleadings and evidence on this particular issue.

In order to present clearly the issue which was before the trial court, we quote from plaintiff's petition as follows:

"On or about the 30th of November, 1948, (or at least a short time prior to January 3, 1949), union defendants, Dixon, Stewart and Vestal, two or more, met in the apartment of Betty Messenger and Audra Torrance at which time there was present Alma Devanport, George Franklin, J. C. Crouch, D. J. Green and George Prda, where the said agents of Local No. 745 explained and proposed contract to said persons and urged the signing thereof and stated that if the company refused to sign said contract that a strike would be called and a picket line established; that the city drivers and dockmen would also go on strike and refuse to work; that city cartage companies and other motor carriers, including truck line defendants would be contacted and prevented from transacting any type of business with plaintiff; that plaintiff's line drivers coming into the Dallas terminal would refuse to drive its equipment or transport its commodities as long as said picket line was maintained and the company would be either forced and compelled thereby to sign the demands and contract of the union and to recognize said union as the bargaining agent of the minority group or else the company would have to cease doing business. George Prda, one of the dock workers acting for himself and others present, definitely stated that if the company refused to sign the contract or recognize the union as the bargaining agent for the clerks, that he and others employed by the company on dock would go out on strike. The business agents and representatives of Local No. 745 agreed and acquiesced in their proposal of said contract and assured other defendants that such course of conduct would be approved and endorsed and adopted as their own acts; and thereafter, on or about the 30th day of December, 1948, the contract was presented to plaintiff's General Manager, and he was requested to sign it without being given time to read or observe contents thereof, and said General Manager advised said business agents that the local had not been certified as the bargaining agent for said clerks and that the company had no way of knowing that a majority thereof had selected said local to act for them and declined to sign the contract until

it was furnished with such proof. Said business agents immediately thereafter called the strike and the city drivers and dockmen called their strike and quit work and went on the picket line with the other defendants to help maintain and carry out their unlawful agreement and conspiracy. Union defendants Dixon, Stewart and Vestal, one or more, on or about January 5th, 6th and 7th, the exact date being unknown to plaintiff, but well known to defendants, talked to the authorized agents and representatives of all the truck line defendants named herein and advised them not to interchange trailers or freight with plaintiff and not to transact any kind of transportation business with plaintiff upon threat of a picket line around their respective terminals in Dallas, further stating to said truck line defendants that any freight exchanged or interlined with plaintiff was declared to be unfair and hot goods and demanded that same not be interlined or handled by any of them. Ace Cartage Company of Dallas had been transporting locally and otherwise some of the freight of plaintiff and said defendants demanded of Ace Cartage Company that it cease to transport such freight. As result of said threats, demands and requests, each and all of said companies refused to interline or exchange freight with plaintiff at any point. On or about December 31, 1948, the union agent presenting the contract told the General Manager Weber that unless that contract was signed and the local recognized as the bargaining agent, a strike would be called and maintained until such contract was signed and agents acknowledged. The defendant, Vestal, told Weber that the union was really after the company now, since the company's shopmen or mechanics had applied for and voted for decertification of said union, further stating to Weber that the law is with you now and you are within your rights, but we are going to have that law changed. * * *"

On February 14, 1949, all of the defendants, except D. J. Green, and the five truck lines filed their answers, and under Paragraph 8 alleged as follows:

"Further answering herein defendants deny that there exists any ground for injunctive relief as prayed and deny that they or any of them have in any way acted in violation of plaintiff's rights. Defendants would further affirmatively show that there exists a bona fide labor dispute between plaintiff and defendants and that in the course of said dispute individual defendants have peacefully picketed plaintiff's place of business by marching in the public street in Dallas, Texas, carrying banner advising the public of said dispute. Defendants have not engaged in any unlawful boycott nor have they made any attempt to picket any

place other than plaintiff's place of business in Dallas. Defendants deny that they are interfering with, attempting to prevent or are preventing the free flow of commerce or preventing transportation of commodities other than by peacefully picketing with truthful banners on the public street in the City of Dallas. Defendants' actions in picketing as above alleged have constituted no physical obstruction to ingress or egress from plaintiff's plant. Defendants deny the use of threats, violence or physical force of any character or any secondary boycott and would show that the only acts in which defendants have engaged have been peaceful attempts to persuade the public to honor their picket signs.

"In this connection defendants alleged that such a ban upon free communication as sought by plaintiff in this cause through the medium of injunction is inconsistent with the guarantee of freedom of speech as guaranteed by the Constitutions of the United States and the State of Texas. Defendants would further show that their picketing and other actions were in the exercise of rights guaranteed to defendants under the Constitutions of the United States and the State of Texas and under Article 5152 and 5153 of the statutes of the State of Texas."

It is apparent from the reading of the pleadings quoted above that in addition to alleging that a picket line was established around the premises of Best Motor Lines and that the employees refused to cross the picket line, this case involves the issue of the right of the union, by threat and coercion, to compel third parties to respect the picket lines and to cease doing business with the parties concerned. In other words, the trial court, at the hearing on the petition for temporary injunction, clearly had before it the questions: (a) was there a labor dispute? (b) was the picketing which began on January 3, 1949, peaceful? and (c) was the picket line established for a lawful purpose? Incidental to these issues, there was also the question of what number of the clerical force constituted an appropriate bargaining unit.

The evidence reveals that the defendant employees, George Prda, George Franklin, J. C. Crouch, D. J. Green, Alma Davenport, Audra Torrance and Betty Ruth Messenger, were members of the petitioner's office force in the city of Dallas, and on December 17, 1948, a meeting was held in the apartment of Betty Ruth Messenger and Audra Torrance, at which the above named defendants were present along with Mr. Stewart, Mr. Vestal and Mr. Dixon, representatives of the Union. Union ap-

plications and authorization blanks were distributed, and a sample contract was read and discussed.

This was the beginning of action on the part of the employee defendants to perfect an agreement with the Union whereby it would endeavor to obtain a contract with the petitioner. No contract of any type had ever been entered into between the company and Local No. 745 covering the clerical employees.

On December 30, 1948, the petitioner discharged the two ladies above mentioned and one other, not because they had joined the Union, but because of inefficiency. The finding of the trial court to this effect is contained in the order granting the temporary injunction, which finding is supported by the pleadings and the evidence.

On the following day, December 31, 1948, two of the Union Officials met with petitioner's general manager, and demanded that the three ladies be reinstated, and that petitioner sign a contract with respondent Union, recognizing it as the exclusive bargaining agent for the office employees.

The proposed contract contained similar provisions to the then existing contracts between Best Motor Lines and Local No. 745, covering its city pick-up and delivery drivers, dock workers and line drivers. The general manager refused to reinstate the three employees, and also refused to sign the proposed contract.

The picket line was established on January 3, 1949, and this suit was filed by Best Motor Lines on the 5th day of February, 1949, alleging damages in the sum of $20,000.00 because of loss of business directly attributable to the concerted acts and conduct of the Union, its representatives and the named employee defendants.

A temporary restraining order was granted on the day the suit was filed, and a hearing on the petition for temporary injunction only was set for February 14, 1949, at which time the hearing began and resulted in the granting of the temporary injunction as heretofore stated.

Mr. Spurgeon, one of Keystone's officials, in response to being questioned as to whether, during the time he was handling freight, Vestal or Stewart or any of the other officials of Local 745 had talked to him about it, said: "Well, my first visit was from Mr. Stewart. *He stated that I was handling hot freight.*

I asked him what he meant, and he indicated he meant a Best trailer that was under lease to me sitting on my lot. I told him then that that trailer was under lease to Keystone Freight Lines; that all the freight on that truck I considered was my freight, because it was covered by Keystone freight bills, and it had been driven into Dallas by a Keystone driver out of the Tulsa local, and he was at liberty to look at any of those papers he wanted to. He stated that he didn't want to look at them." He further testified that he did not quit handling the freight, and that "on Saturday afternoon, Mr. Vestal and Mr. Stewart and one other gentleman did visit my office and they began asking me about handling that business and as to why I was pulling Best trailers and I told them then that I didn't have enough trailers of my own and I leased some of Best trailers and pulled it in. Then they went out and talked to my men about it" which he testified were his city pick-up and delivery and dock workers, and checkers that were on duty on the docks, and after Vestal and Stewart had talked to them they "informed me that they couldn't work any more Best trailers," and they did "not after that day." (Emphasis ours.)

With reference to some freight Mr. Spurgeon received from Best Motor Lines that was to be interlined with Sunset Motor Lines for final destination at Fort Worth, he testified as follows: "we had a shipment of around ten to eleven thousand pounds destined for Fort Worth. It was on a trailer leased from Best Motor Lines when it arrived in Dallas. We placed all freight we had for Sunset Motor Lines on that trailer and pulled that trailer onto their lot and backed up to the Sunset dock. *At that time, their men told our driver they would not go into that trailer.*" In response to the question as to what happened to the freight destined for Fort Worth, Spurgeon said "*we brought the freight back and interlined it with another company who was not a member of Local 745*" and named Red Ball, Sproles-Red Ball. (Emphasis ours.)

In answer to the Court's query as to just what the men did say to Mr. Spurgeon about not handling any more Best stuff, he testified: "*Well, they didn't refuse to handle the freight as long as it was on my trailer and covered by my freight bills. All they refused to do was enter a trailer I had leased from Best Motor Lines.*" (Emphasis ours.)

On being questioned as to whether because of the situation, Mr. Spurgeon couldn't handle any more of Best's freight, he answered "we had to cut down on that part of the freight that

we could handle on our own equipment, which cut down the volume that could be handled, * * * well, I think we cut out for a period of two or three days until we got caught up."

Mr. Spurgeon further testified that the custom of interchanging trailers among motor carriers was "an established procedure," that it was approved by the Interstate Commerce Commission and the Railroad Commission of Texas, and that they normally interchanged trailers with any carrier where it was profitable business to do so, and that that was the type of exchange of trailers that they were objecting to, and that "we didn't interchange trailers and bring them to our docks, no sir."

He testified further that after the conference with the officials, they did not bring them on their docks.

On being questioned why he did not bring some freight that had been concentrated in Tulsa, which he brought into Dallas, and did not take to his terminal, Mr. Spurgeon testified "well, the reason I didn't bring it to my dock, I didn't want to have to order those men to go in that trailer and have them to refuse to work it, then have a trailer sitting there at my dock. * * * *Because if they refused to work it after I ordered them to, then, there would be a dispute between them and me.*" (Emphasis ours.)

The testimony of C. H. Jaggers, Terminal Manager of the M & D Motor Freight Lines shows that normally their company and the Best Motor Lines interlined freight and transacted freight business one with the other, and that after the picket line was erected Mr. Dudley with Best Motor Lines, called him with respect to handling of some freight to Oklahoma City, and he said: "Well, when he asked me if we could handle it, I told him if he would bring it over to our premises, that we would haul the freight for him or pull his trailer for him."

Mr. Jaggers further testified, in response to being asked why he couldn't send one of his drivers over to Best Motor Lines for the freight that "on account of our contract reads, 'The employer shall not require or request an employee covered by the contract to cross a picket line.' "; *that his company did have a contract with Local 745; that they did have Mr. C. B. Cole as their job steward, and that he discussed the handling of this freight for Best Motor Lines with him,* and Cole told me "that he called and talked to the business manager, and he told me that the business manager told him that he would rather that he didn't handle the freight * * * (Emphasis ours).

On being questioned on whether he told Mr. Dudley anything other than if he would bring the freight to his dock, he would handle it, Mr. Jaggers testified, "Yes, if he would bring it to us, we would haul it"; *that he told the Union steward, Mr. Cole, those were his intentions; that Mr. Cole did not agree with him entirely and was undecided about it, and "said he would like to discuss it with the business manager for the Local" and that after Cole had talked to the business manager for the Local "that the business manager told him he would rather that we didn't handle it; that he didn't handle it."* (Emphasis ours.)

The trial court, at the conclusion of the evidence, entered its order granting the temporary injunction as prayed for by Best Motor Lines and at the request of the defendants made its Findings of Fact and Conclusions of Law. These findings were incorporated in the order granting the injunction.

The trial court, in granting the temporary injunction, held with the plaintiff, Best Motor Lines, on all the issues named above. The Court of Civil Appeals, in reversing the judgment of the trial court, and therefore dissolving the injunction, held that (a) a labor dispute existed, (b) the picketing was peaceful, and (c) was for a lawful purpose, and was not in violation of the Anti-Trust laws of Texas; and it further held that the picket line was not maintained for an unlawful purpose, and that it did not constitute an effort to force the employers to bargain with the Union with reference to rates of pay, employment and working conditions when the Union represented only a minority group of an appropriate unit of employees.

The petition for writ of error, filed by Best Motor Lines, confines the questions before this Court to two points; namely: (1) that the picket line maintained by respondents was a part of a combination or trust in violation of the Anti-Trust statutes of Texas, and (2) that the picket line was for an unlawful purpose because it constituted an effort to force the petitioner to bargain with the Union, with reference to rates of pay, wages and working conditions when the Union apparently represented a minority group of an appropriate unit of employees.

Therefore, we proceed on the premise that a labor dispute existed and that the picketing near the premises of petitioner was peaceful.

With reference to the question as to whether the actions and conduct of the defendants constitute a violation of the Anti-

Trust laws of Texas, the trial court made the following findings of fact and conclusions of law, all of which we deem pertinent to this particular issue:

"(14) While the strike was in progress, Betty Messenger, one of the Defendants, told another clerk employee that she did not know why they were striking, but that she would like to go back to work a half a day or so in order that she could mess up the company's records. Betty Messenger and Audra Torrance were the only ones of the seven clerks who knew that a picket line was to be established or knew that it was there until they saw it or heard about it.

"(15) A few days before the picket line was established and the strike called, George Prda told Mary Phelps, one of the clerks, that the line drivers and dockmen and city drivers and the Union officials would all be behind the clerks and if the Company did not sign the contract when it was presented to them, 'we will tie them up so they can't operate' and they will have to do something about it. This threat was carried out.

"(16) H. B. Dudley, Superintendent of operations of Plaintiff, called Stewart, the business agent, after the picket line was established and advised him that there was freight on hand which necessarily should be moved and delivered and that all of the drivers and dock workers had refused to work and asked that Stewart and the Union furnish men to remove such freight. Steward refused to furnish such men unless the contract as proposed was signed. * * *

"(23) After such picket line was established, Local 745, its business agents and stewards, objected to Plaintiff's connecting carriers handling any freight for or on account of Plaintiff and the Defendants Stewart and Vestal, as agents of the Local, advised at least one company that it was handling 'hot' freight, referring to the freight of Plaintiff. The manager of Keystone Freight Lines testified that after the conversation with these business agents, he was of the opinion that if he required his drivers to cross a picket line, a strike could be called against his company. * * *

"(26) Beginning some time either the last of November or the middle of December, 1948, the Union Defendants agreed, one with the other, expressly, tacitly, impliedly, and by their acts and conduct, then agreed upon and thereafter adopted and executed and continued, to confederate and act together in a concerted effort to do all of the things and make all of the statements and bring about the results as stated herein, which they

did; that the acts, words, and conduct of each and all of said defendants and others not named as defendants, but knowing the object thereof, are shown by the evidence to have joined in with Defendants and adopted their previous acts and engaged in further executing said plan and confederation, each approved the acts and conduct of the other and of all, which resulted in an unlawful combination and conspiracy in violation of the laws of the State of Texas and of the United States and was actuated in a spirit of revenge and with malice as against Plaintiff and with threats amounting to the fear of violence to the public generally with the results as set forth in Plaintiff's original Petition and its First Trial Amendment. * * *

"(29) All facts not specifically enumerated herein are found for and in behalf of Plaintiff and against the Defendant."

On this question the trial court filed its Conclusions of Law as follows:

"A. The acts and conduct of the Defendants in establishing and maintaining said picket line were in violation of the Anti-Trust Laws of Texas in that they constituted restrictions in trade and commerce and aids to commerce and restricted transportation and restricted Plaintiff in the free pursuit of its lawful business. It prevented and lessened competition in transportation. It constituted an agreement by which all parties thereto agreed not to transport commodities or freight for the public or for other persons if Plaintiff had any connection therewith.

"B. Said acts were in violation of Article 884, R. S. Texas, 1925, in respect to the duties imposed upon motor carriers to transport goods when tendered to them for such purpose, upon the tender or payment of the customary freight rates authorized to be charged therefor. Said acts are in violation of Article 6360 R. S. Texas, 1925, in respect to the refusal of any carrier to refuse to transport property or to deliver same to the public generally in the usual course of business." * * *

"I. Said acts and conduct constituted and had the effect of putting in actual existence and continuation a secondary boycott and a secondary picket line against Plaintiff, all in violation of the laws of Texas and of the United States.

"J. Said acts caused the Truck Line Defendants and other connecting line carriers normally doing business with Plaintiff to breach and fail and refuse to observe and carry out the terms and conditions of the lawful binding contract with Plaintiff in respect to exchanging, interlining, and picking up and delivering freight from and to their respective docks and terminals.

"K. No right of free speech on the part of Defendants is transcended by an injunction restraining the picketing of a place of business by persons (whether members of a labor organization or union, or not) when they seek, as they did here, to prevent the public from trading with the picketed place of business and to compel its owner and others with whom it normally transacts business to break a contract existing between plaintiff and such third persons."

Respondents assert that this case, as submitted here, does not involve anything more than a voluntary refusal by individual truck drivers to cross a peaceful and lawful picket line.

They made the contention before the Court of Civil Appeals, and the same contention is being made before this Court, "that since peaceful picketing is lawful and is protected by the First and Fourteenth Amendments to the Constitution of the United States, *conduct which amounts to no more than peaceful picketing can in no sense be regarded as violating the Anti-Trust laws of this State*," International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 745 v. Best Motor Lines, 229 S.W. 2d 918, (emphasis ours).

The Court of Civil Appeals cited the case of Ex Parte Henry, 147 Texas 315, 215 S.W. 2d 588, 595 in support of its holding that the respondents herein had not, by their acts and conduct, violated the Anti-Trust laws. Then, the Court went further and included in its opinion the following quotation from the Henry case: "So long as the fundamental law guarantees the right of a citizen to do a given act, that act cannot be effectively condemned either by statute or by judicial decree." In effect, the Court of Civil Appeals has held that the acts and conduct of the Union, its representatives and members amounted to no more than peaceful picketing. With this holding, we cannot agree, neither can we agree with its interpretation of the Henry case, supra.

■ We hold that the evidence, a part of which is set out above, was sufficient to justify the trial court's finding that the defendants had entered into an alleged conspiracy, and that the respondents cannot, by such actions and conduct, use a peaceful picket line in connection with a course of conduct clearly in violation of our laws against conspiracies in restraint of trade. The refusal of petitioner's own employees to cross a peaceful picket line would not be a violation of our Anti-Trust laws. This holding in no way affects the right of third persons to volun-

tarily, and as a matter of personal decision, refuse to cross a picket line. As said in the Henry case, supra:

"Picketing does not offend against the statutes merely because third parties who come to the area of the dispute may prove sympathetic to one disputant rather than to the other."

■ Furthermore, unions have the right, and this decision in no way affects their right, to attempt to persuade third parties who come to the area of the dispute to be sympathetic and to respect the picket line. These principles of law were clearly stated in the Henry case. In that case, the Greenville Cotton Oil Company claimed, in its pleadings, that the *acts* of Henry, et al constituted a violation of the Anti-Trust laws of this State, Arts. 7426 and 7428, R. C. S., 1925, Vernon's Ann. Civ. Sts., and amounted to secondary picketing and secondary boycotting. Associate Justice Brewster, after reciting the evidence on this point, held that the relators by their acts and conduct had not violated the Anti-Trust laws of this State. A reading of the evidence referred to readily convinces us that the Henry case was correctly decided, and that our holding in this case does not in any manner conflict with, or set aside the holdings, in Ex Parte Henry. The case was entirely void of evidence of proof of a conspiracy in restraint of trade, or of proof of any acts and conduct on the part of the relators showing they were determined to force the employer to sign a contract or cause third parties to cease transacting business with it. The evidence in this case shows such a purpose and we deem the same to be unlawful and in violation of the Anti-Trust laws, and that the trial court properly granted the temporary injunction.

■ The Texas Anti-Trust statutes are valid laws and all persons are subject thereto, and the courts have the power to enjoin acts and conduct in violation thereof. Labor unions are not excepted, even though there exists a labor dispute and the picketing is peaceful. As said in the case of Bakers & Pastry Drivers v. Wohl, 315 U. S. 769, 62 S. Ct. 816, 86 L. Ed. 1179: "A state is not required to tolerate in all places—even peaceful picketing." We think the case of North East Texas Motor Lines v. Dickson, 148 Texas 35, 219 S.W. 2d 795 announces a correct principle of law, and supports our holding that picketing is subject to some limitations. It was said in that case "it would hardly be questioned that while peaceful picketing is free speech, it is more than free speech; it is economic coercion as well * * * the coercive element of picketing necessarily makes it subject to some limitations which might not properly be imposed on other methods of communicating facts and opinions."

Then we find in the case of Giboney v. Empire Storage & Ice Company, 336 U. S. 490, 69 S. Ct. 684, 93 L. Ed. 834, a very interesting discussion of the question involved in this case. This is a case decided after the opinion in the Henry case, and, of course, after the cases of Carlson v. State of California, 310 U. S. 106, 60 S. Ct. 746, 84 L. Ed. 1104, and Thornhill v. State of Alabama, 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093, which were therein discussed. In the Giboney case, the Court, in holding that the picketing, although peaceful, could be enjoined, said:

"It rarely has been suggested that the constitutional freedom *for* speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now. Nothing that was said or decided in any of the cases relied on by Appellants calls for a different holding.

"Neither Thornhill v. Alabama, supra, nor Carlson v. California, 310 U. S. 106, 60 S. Ct. 746, 84 L. Ed. 1104, both decided the same day, supports the contention that conduct otherwise unlawful is always immune from State regulation because an integral part of that conduct is carried on by display of placards by peaceful picketers . . .

"We think the circumstances here and the reasons advanced by the Missouri courts justify restraint of the picketing which was done in violation of Missouri's valid law for the sole immediate purpose of continuing a violation of law . . .

"Placards (carried by pickets) used as an essential and inseparable part of a grave offense against an important public law cannot immunize that unlawful conduct from State control . . .

"We hold that the State's power to govern in this field (regulation by anti-trust laws) is paramount, and that nothing in the constitutional guaranties of speech or press compels a State to apply or not to apply its anti-trade restraint law to groups of workers, business or others."

Respondents rely on Articles 5152 and 5153, Vernon's Ann. Civ. Statutes, to support their position.

Article 5152 reads:

"It shall be lawful for any and all persons engaged in any kind of work or labor, manual or mental, or both, to associate themselves together and form trades unions and other organiza-

tions for the purpose of protecting themselves in their personal work, personal labor, and personal service in their respective pursuits and employments."

Article 5153 reads:

"It shall be lawful for any member or members of such trades union or other organization or association, or any other person, to induce or attempt to induce by peaceful and lawful means, any person to accept any particular employment or to enter or refuse to enter any pursuit or quit or relinquish any particular employment or pursuit in which such person may then be engaged. Such member or members shall not have the right to invade or trespass upon the premises of another without the consent of the owner thereof."

Under these statutes, labor unions are permitted to organize and work for the betterment of their members. However, they are met with Article 5154, which reads as follows:

"The preceding Article shall not be held to apply to any combination or combinations or to any act by any member of such trades union or other organization or association, or any other person, or to an agreement between two or more persons, formed or taken for the purpose of limiting the production, transportation, use or consumption of labor's products, *or which creates a 'Trust' or 'Conspiracy in Restraint of Trade', as defined by the laws of this state. Nothing herein contained shall be held to interfere with the terms and conditions of private contract with regard to the time of service or other stipulations between employers and employees. Nothing herein shall be construed to repeal, affect or diminish the force and effect of any statute now existing on the subject of trusts, conspiracies against trade, pools and monopolies.*" (Emphasis ours.)

Thus, it will be seen that the very statutes which give the unions life, expressly provide that their activities must conform to the requirement of our Anti-Trust statutes. Furthermore, in Section 1, Art. 5154a, Vernon's Ann. Civ. Sts., the Legislature, in its declaration of public policy, has declared that labor unions affect the economic conditions of the country and state; that they enter into practically every business and industrial enterprise, and that "it is the sense of the Legislature that such organizations affects the public interest and are charged with a public use."

In the Giboney case, supra, the Court held that labor unions

were subject to the Anti-Trust laws of Missouri, and in so holding, said:

"Missouri has decided to apply its (anti-trust) law without exception to all persons who combine to restrain freedom of trade. We are without constitutional authority to modify or upset Missouri's determination that it is in the public interest to make combinations of workers subject to laws designed to keep the channels of trade wholly free and open. To exalt all labor union conduct in restraint of trade above all state control would greatly reduce the traditional powers of states over ·their domestic economy and might conceivably make it impossible for them to enforce their anti-trade restraint laws. More than that, if for the reasons here contended, states cannot subject union members to such anti-trade restraint laws as Missouri's, neither can Congress. The Constitution has not so greatly impaired the states' or nation's power to govern."

Having reached the conclusion that the trial court properly granted the temporary injunction, we do not deem it necessary to decide the question as to what number of the clerical force constituted an appropriate bargaining unit.

This case has not been tried on the merits; therefore, this opinion is based solely upon the facts presented at the hearing on the petition for temporary injunction, and is no attempt to determine facts on a final trial where all parties have introduced their testimony.

The judgment of the Court of Civil Appeals in dissolving the temporary injunction is reversed and the judgment of the trial court is affirmed.

Opinion delivered February 21, 1951.

Mr. Justice Wilson did not participate in the decision of this case.

MR. JUSTICE GARWOOD, dissenting.

Doubtless this is as much a concurring opinion as a dissent, though, as below indicated, I do disagree in part with the disposition made of the case.

As I understand the view expressed in the opinion of the court, we would not sustain the injunction on the basis of the anti-trust laws, except for the evidence that, following estab-

lishment of the picket line, there was an agreement between the Union on the one hand and, on the other, the defendant carriers, to the effect that the latter would not handle the plaintiff's freight, even though such handling did not involve crossing the picket line at the plaintiff's place of business. Or perhaps it is that the agreement, which is the basis of the antitrust law violation, is merely one between the individual members of the Union themselves—not one merely to respect the picket line—but to restrain commerce by refusing to drive or do other work concerning trucks wherein the defendant carriers meant to handle the plaintiff's freight and thereby inducing the defendant carriers to cease all attempts to handle such freight. There is. of course, stronger evidence of this latter agreement than there is of an agreement made by the defendant lines with the Union, though there seems to be support for both.

I further understand that we do not here mean to hold it a violation of our antitrust laws or other laws for a Union and an employer to agree that the employer will not request its employees to cross a picket line or that the existence of such an agreement between the Union and the defendant carriers, plus the fact that those carriers and their employees respected it, plus the further facts that a picket line was established and the plaintiff's business thus curtailed, is enough to establish a violation of the antitrust laws. It is contended for the plaintiff that this much evidence does establish the violation, and in fact the trial court held this same contractual provision to be illegal, but I understand we do not rule upon the point.

Upon these assumptions, I agree with the majority view that there has yet been a violation of law by the Union and that injunctive relief is in order. However, I do not agree that the injunction in the terms granted should be approved.

The RESTATEMENT, TORTS, sec. 815 reads:

"In framing an order enjoining concerted action by workers under the rule stated in sec. 813, the following are important guides:

(a) the order should enjoin only tortious conduct, except as stated in sec. 816;

(b) the order should be as specific as practicable in describing the conduct enjoined and should avoid as far as possible question-begging or omnibus words or provisions;

(c) the order should be written in simple language intelligible to workers without the aid of lawyers;

(d) the order may describe generally or specifically the kind of conduct which it does not restrain;

(e) the order may impose restraints on the plaintiff as conditions of its restraints on the defendants."

The Comment immediately following sec. 815 states that the text applies to temporary as well as permanent injunctions. Clearly the same principles will apply whether the ultimate basis of the injunction is statutory or common law.

In Construction & Gen. Labor Union, Local No. 688 v. Stephenson, 148 Texas 434, 225 S.W. 2d 958,963, while sustaining "the granting of the injunction" on the ground that the picketing was for the object of compelling a closed shop, we yet took pains to modify "the terms of the injunction", so as to eliminate "the requirement that before picketing will be permitted there must be a dispute between Stephenson and a majority of his employees * * *." We also took pains to observe that "the application of the injunction is of course to be confined to picketing for unlawful purposes, as disclosed by the facts of this record, and is not to be construed to prevent peaceful picketing at proper places for lawful purposes or other methods of publicizing any legitimate protests which petitioners may have against respondent."

In the instant case, I think the injunction operates to deter the Union henceforward from maintaining a picket line, even though hereafter there should be no repetition of the acts which we find to make an otherwise valid course of conduct unlawful. This seems overly severe. Possibly the inference from the opinion is that such picketing may be done notwithstanding the injunction, but, if so, it is less than clear. If it be true that after the matter of a permanent injunction is determined, should it be determined adversely to the Union, proper picketing may yet be safely indulged in, why should it not be permitted now? It should be practicable to draw an order that will forbid picketing if accompanied by certain types of conduct but will permit it if not so accompanied. A reading of the pleadings and briefs discloses that the picketing is a most important point with which the parties are concerned—it and the contractual provision, whereby the defendant lines agree not to require their employees to cross picket lines. If I correctly understand us to hold that there was nothing wrong about the picketing itself and to refrain from holding the contractual provision invalid, the essence of the Union's offense was its conduct over and beyond the picketing. And since the picketing alone may be a useful right,

I think it only fair to permit it to continue under proper restrictions.

In the Giboney case (336 U.S. 490) the picketing itself could properly be enjoined in general terms because, but for the unlawful object of forcing the plaintiff to discriminate between its customers, there would have been no picketing. Here, on the contrary, the picketing was actually begun before the unlawful acts of the Union took place, and might well continue in a peaceful manner and serve a lawful purpose of the Union in its controversy over recognition, without a repetition of the unlawful acts. Its object of procuring recognition, which we do not say to be illegal, and which is not so, in my opinion, may quite logically be sought without, as well as with, the other conduct, which we have declared to be unlawful. In the Giboney case, this was not the situation. There the picketing could serve no purpose, remote or proximate, if it did not first serve the unlawful purpose of making the plaintiff discriminate between its customers. The situation here would be more comparable to the Giboney situation, if the Union here had picketed the defendant carriers as well as the plaintiff. In such event we might well have enjoined the picketing of the defendant carriers in general terms, just as we might now in general terms enjoin the Union from preventing its members entering the trailers leased from the plaintiff by the defendant carriers or doing other duties which did not involve depriving the Union members of their contractual right not to have to cross a picket line.

I think the order of injunction should be modified and approved only as modified.

Opinion delivered February 21, 1951.

Rehearing overruled April 11, 1951.