TEXAS STATE FEDERATION OF LABOR et al. v. BROWN & ROOT, Inc.

No. 9984.

Court of Civil Appeals of Texas. Austin.

Feb. 6, 1952.

Rehearing Denied Feb. 27, 1952.

940

Mullinax, Wells & Ball, Marion C. Ladwig by L. N. D. Wells, Jr., all of Dallas, Creekmore Fath, of Austin, Dixie & Ryan by Robert Eckhardt, Combs, Brown & Brock by W. A. Combs, all of Houston, for appellants.

Powell, Wirtz & Rauhut, John B. Connally, Ben H. Powell, Jr., A. J. Wirtz, Looney, Clark & Moorhead, Donald S. Thomas, Everett L. Looney by R. Dean Moorhead, all of Austin, for appellee.

PER CURIAM.

This appeal is from an order granting a temporary injunction, issued at the instance of Brown & Root, Inc., a construction firm, against fifty-six local unions which function in Beaumont, Houston and Austin, respectively, against the Building Trades Councils of the same cities, of which some of the local unions are constituents, against the Texas State Federation of Labor, which consists of local American Federation of Labor unions throughout the State of Texas, and against two carpenters' councils and the Houston Labor and Trades Council.

Appellee, by its petition, sought monetary damages as well as injunctive relief upon allegations that appellants conspired, in violation of Texas statutes, for the purpose and with the object of destroying appellee and its business through the use of unfair lists, pickets and secondary boycotts because appellee would not discriminate against nonunion workmen in the employment of labor, and because it would not deny to its employees the right to bargain with respect to wages, hours and working conditions, in violation of the Texas "Right To Work Act."[1]

The temporary injunction enjoined appellants from:

(a) Picketing Appellee.

(b) Placing the name of Appellee upon an unfair list.

(c) Entering into or continuing any agreement or combination to force appellee to deny employment on account of nonmembership in a labor union.

(d) Boycotting appellee, provided, however, "that this does not preclude defendants from agreeing to refuse to work directly for and as employees of" appellee.

(e) Boycotting persons or firms because they transact business with appellee.

(f) Agreeing or combining to boycott for the purpose of preventing third parties from transacting business with appellee by refusing or threatening to refuse to handle products of such third parties, or by refusing or threatening to refuse to work for third parties.

(g) Refusing or threatening to refuse to work for third parties because appellee "is performing or may perform work in the same area or on the same construction project."

Such restraint is subject to the following provision in the judgment: "If a bona fide labor dispute should hereafter arise between plaintiff and defendants, or one or more of them, or, because of changed conditions otherwise, defendants might be

1. Art. 5207a, Vernon's Ann.Civ.St.

legally entitled to engage in picketing or other activities herein enjoined, this court, upon application and proper showing to it, will modify this order or take such further action herein as may then appear necessary and proper to protect the rights of the parties."

Appellants' first point is that the trial court had no jurisdiction of this suit for the reason that Congress has vested exclusive jurisdiction of controversies of this nature in the National Labor Relations Board and the United States Courts.

We have thought this question to be before our Supreme Court in the case of Dallas General Drivers, Warehousemen & Helpers v. Houston & North Texas Motor Freight Lines, 245 S.W.2d 481 because of the notation made by the Court in granting writ of error on June 6, 1951. However, the Court made no express ruling on this point.

In International Molders & F. W. U. v. Texas Foundries, Tex.Civ.App., Beaumont, 241 S.W.2d 213, writ ref. N. R. E., the same contention was made and overruled.[2]

Upon this authority and because the Supreme Court has taken jurisdiction of labor disputes several times since enactment of federal labor laws creating the National Labor Relations Board, 29 U.S. C.A. § 151 et seq., we hold that the Court below had jurisdiction of this controversy.

Appellants' second point is that appellee should have pursued its administrative remedy through the N. L. R. B. to exhaustion before resorting to the courts.

This point is overruled because neither the N. L. R. B. nor the Federal Court at the instance of N. L. R. B. could determine appellee's claim for damages. Exhaustion of administrative remedies is required only when such agency can give adequate relief. 24 Tex.Jur., p. 130.

It is no answer to say that damages could have been sought in one forum and injunctive relief in another, for this "would involve the bringing of separate and independent suits, productive of multiplicity and vexation." Berwald's, Inc., v. Brown, Tex.Civ.App., Dallas, 69 S.W.2d 221, 223.

Then, too, there is no certainty that the N. L. R. B. would entertain a complaint by appellee. Its duty to do so is discretionary. National Labor Relations Board v. Denver Building and Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L. Ed. 1284, loc. cit. 1292, 1293.

Appellants' third point is that appellee does not come into court with clean hands since it is engaged in a campaign to depress wages and working conditions, to flout the Federal Labor Laws, and to destroy labor organizations.

There is little, if any, evidence that appellee does not maintain excellent working conditions. Affirmatively, the record shows that it has received a credit on its workmen's compensation insurance rate of 31.3%, indicating that its safety record is 31.3% better than the average.

There is some evidence that in all instances appellee does not pay union wages to employees of the same classification. Appellee explains that this is due to the kind of construction work performed by it, which is heavy construction, such as dams, bridges, highways, etc.; and that in this type of construction carpenters, electricians, plumbers and other craftsmen need not have or exercise as great skill as is required in the construction of buildings, and that less skill being required less wages are paid.

We find no evidence that appellee is engaged in a campaign to flout the labor laws or to destroy labor organizations.

The evidence which we have summarized under this point is, in our opinion, insufficient to convict appellee of conduct so unconscionable or inequitable as to preclude its resort to a court of equity for relief from the wrongs alleged in its petition herein.

By the fourth point appellants assert that the court in enjoining picketing and other publication of appellee's unfair conduct deprived them of their constitutional right of free speech.

2. Writ of Error granted on rehearing Feb. 6, 1952.

■■ Peaceful picketing of and publicizing facts about an employer of labor are protected by the constitutional guaranty of free speech only so long as they are in furtherance of a lawful objective. Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834; Best Motor Lines v. International Brotherhood of Teamsters, Tex.Sup., 237 S.W.2d 589; Construction and General Labor Union v. Stephenson, 148 Tex. 434, 225 S.W.2d 958. Nor is it necessary that the *sole* object of the picketing and distribution of unfair lists be unlawful in order to justify injunctive relief; it is sufficient that *an* objective of such be unlawful. National Labor Relations Board v. Denver Building and Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299.

Therefore, we need not consider evidence which might tend to show that appellants' activities were in furtherance of lawful objectives. We need only look for evidence which establishes, prima facie, that such activities were in furtherance of an unlawful objective, one or more.

It is unlawful in Texas:

1. For all persons, including labor unions and their members, acting singly or in concert with others, to establish, call, participate in, aid or abet a secondary strike, or secondary picketing, or a secondary boycott as provided and defined in Art. 5154f, V.A.C.S.

2. For any person to be denied employment on account of membership or non-membership in a labor union. Art. 5207a, V.A.C.S.

3. For any contract to require or prescribe that employees or applicants for employment, in order to work for an employer, shall or shall not be or remain members of a labor union. Id.

If, therefore, appellants' activities were for the (an) immediate purpose of causing a violation of either of these statutes, such activities were unlawful and could be enjoined without encroaching upon the constitutional rights of appellants. Stephenson case, supra.

Appellants admit that they are guilty of violating Art. 5154f. We quote from their brief: "We admit that coercive secondary boycott, as recited in those instances reported in Subsection (7) of this brief at p.p. 36–37, supra, is unlawful." .

From pages 36–37 of appellants' brief we quote:

"Appellee commenced construction of the Rice Stadium in December, 1949, or January, 1950. The construction site was picketed from early January, 1950, until its completion in October, 1950. * * *

"In the course of the construction, a great many suppliers of materials crossed the stadium picket line: Bell Bottom Foundation Drilling Company; W. D. Haden Concrete Co.; Peden Iron & Steel Co.; Safeway Scaffold Co., among others.

"There is evidence that when the above-named suppliers of the stadium job sought to serve other job sites where union men were working, union men refused to handle or install the products of these named companies because they had crossed the stadium picket line. We will not burden the court with a specification of each of these instances. * * * We recognize that there is sufficient evidence which, if believed, supports a presumed finding that for a short period of time—not more than a month—in late March and early April, 1950, the H. B. T. C. did refuse to handle such materials on Ebasco South End Material Co., Rice Gymnasium, University of Houston, Limebeck Construction Co., Dent's High School, and perhaps a few other jobs."

These unlawful activities were enjoined by the 53rd District Court of Travis County in July 1950, in cause No. 87043, styled State of Texas v. Houston Building and Construction Trades Council et al.

In view of these admissions we need not elaborate upon the evidence showing or tending to show violation of Art. 5154f.

■■ The effect of Art. 5207a is to make the "closed shop" illegal in and against the public policy of the State of Texas. By "closed shop" we mean one in which membership in a union by the employee is required in order to obtain or retain employment.

There is ample evidence, in our opinion, to remove the taint of arbitrariness from the action of the trial court in concluding that, prima facie, a violation of Art. 5207a has been shown.

We are dealing with a tremendous record and a short summary of it all would be too lengthy to embody in this opinion. We will, therefore, cite only so much of the evidence on this issue required to demonstrate that the trial court did not act arbitrarily in this respect.

Appellee undertook the construction of a compressor station near Beaumont. This job was not completed at the site originally selected because of union picketing and ensuing mob violence.

Mr. Muldowney, superintendent for appellee, met with Mr. Ed. DeLatte, business agent for the Beaumont Trades Council, in an effort to reach an understanding. This meeting ended in failure because, as Mr. Muldowney testified:

"A. They said they would open the job on one condition.

"Q. What was that condition? A. That we employ all of their men except me. They would permit me to run the job as superintendent. Other than that, we would employ all men from the Beaumont local unions.

"Q. Did they say anything about wages, hours or working conditions? A. No, sir. Wages, hours and working conditions were only discussed—well, I would say were not discussed officially, because everyone was agreed that our wages and conditions were about the same as they had in Beaumont.

"Q. Did they raise any question that you would have to first raise your wages? A. No.

"Q. Or change your conditions or anything like that? A. No.

"Q. The only condition that they required of you was that you hire all union men? Is that correct? A. That is right.

"Q. Except yourself? A. That is right. All but myself.

"Q. All members of the Beaumont Building Trades Council? A. Yes, sir.

"Q. Except yourself. A. That is right.

"Q. What else? Was there anything else discussed? A. No, the meeting broke up."

After the meeting broke up, Mr. Muldowney was told by one of the union representatives, "that we may build the job, but we would damn sure know we did."

The May 13, 1949, minutes of Carpenters Local 753 of Beaumont recite: "Brother Brown gave his report as B. A. Brown & Root have moved into this area and are attempting to do a job with unfair labor. He urged that volunteer pickets go on the site on the week-end."

Minutes of the same date of the Beaumont Ironworkers Local 125 recite: "The Brown & Root Company has started a job out on the Port Arthur Highway, and the Building Trades Council immediately set up a picket line. There have been reports that several non-union workers have been beat up and threatened. Brother Matthews says that we are lucky in having peace officers in this section of the country that are friendly towards labor, because under the present laws they could make it tough on us when things happen as such has happened since Brown & Root moved in here."

Minutes of the Beaumont Trades Council reflect that on August 11, 1948, a motion was made and carried that "all commercial work in the city be one hundred per cent union work."

Other minutes of this organization show that in numerous instances nonunion workmen had been forced off their jobs by members of the councils.

On June 6, 1949, in a column called, "The Man Behind the Scenes," sponsored and circulated by the Texas State Federation of Labor, there appeared the following:

"Herman Brown, the stud buck of the Brown & Root Construction Co., has finally run into a situation he is hard put to get out of.

"He moved a scab crew into Jefferson County to start a compressor station on the Little Inch gas pipeline which he also partly owns. Some of the boys in Beau-

mont didn't have anything else to do, so they put up a picket line around the job. Later that day, as the imported workers were being taken back into Beaumont by bus, the bus had an accident. It collided with a car, and somehow the bus got showered with beer bottles in the process. There were indications that some of the Brown scabs got struck by the shower of bottles. * * *

"Of course, Brown hasn't asked us for advice. He has two or three law firms hired all the time to give him that, for a fee. But we'd give him a bit of advice, for free:

"If he really wants that compressor plant built, he'd better find himself a union sub-contractor to build it.

"Here's the point, without any Taft-Hartley double-talk. As long as none of Brown's scabs are in Jefferson County, there isn't any riot or disturbance, * * *.

" * * * local opinion in Jefferson County is overwhelmingly for organized labor and against open shop operators like Brown."

On May 10, 1950, the minutes of the Beaumont Trades Council reflect this resolution: "Be it resolved that as of June 5, 1950, this Building Trades Council and all of its affiliated local unions shall insist that all men working on any job coming under the jurisdiction of this Council be declared one hundred per cent union, and each respective local union will support this resolution and insist that all their members have quarterly working Building Trades cards. And furthermore, be it resolved that this resolution supersede all past agreement."

Appellee was picketed in Houston by the Houston Trades Council in the construction of Rice Stadium. Shortly before this work commenced, Mr. Herman Brown, appellee's president, met with Mr. Charley Jones, Secretary of the Houston Trades Council, and several other union representatives of Houston. This was in December 1949.

At this meeting Mr. Brown testified there was no discussion about wages or working conditions on the stadium job, but that Mr. Jones stated that, "they wanted to furnish all the men for the stadium to give me a trial and let me see how good they were and start out on a compromise of just them manning the stadium alone."

Mr. Brown further testified:

"Q. You mean a portion of the men or all of them? A. All of the men.

"Q. What, if anything, did you say about permitting him to furnish a portion of the men? A. I told him he could.

"Q. What did he say about that? A. He said he didn't want to do that.

"Q. What, if anything, did he say about the fact that they would furnish all of the men or none of the men? A. That is what he said."

In a press release, dated December 29, 1949, Mr. Jones is quoted as saying:

"That the Houston Trades Council executive committee, representing 32 labor organizations, voted Thursday, December 29, to picket the Rice Stadium project, 'unless some kind of an agreement is reached with Brown & Root, Inc., contractors, concerning the hiring of local union workers on the project.' * * *

"Commercial construction work of this nature in the Houston area has never been done except by union labor."

Another press release by Mr. Jones on January 2, 1950, stated: "Pickets will be posted at the stadium project until an agreement concerning the hiring of local union workers is reached with Brown & Root."

On January 3, 1950, the Houston Chronicle in a story about the Rice Stadium picketing reported: "Charles E. Jones, secretary of the Council, said picketing was started to force the contractors to hire union labor exclusively."

The man who wrote this story had no independent recollection of Mr. Jones having made such statement, but he testified that if Mr. Jones had not made the statement it would not have been in the story.

Appellee, on January 26, 1950, was awarded a contract by the City of Austin to install boilers in its power plant. On this job the City of Austin prescribed the

wages to be paid and the job classifications. These were substantially in accord with union wages and classifications then in effect.

On January 24, 1950, a group of union officials, including Mr. Sparks, Secretary of the Texas State Federation of Labor, and Mr. Smith, President of the Austin Trades Council, met with officials of the City of Austin to protest the letting of this contract to appellee. There is evidence that at this meeting Mr. Sparks said: "If you work non-union men, you have missed your chance of a smooth job. * * * These men are union men and Brown & Root does not work union men."

That Mr. Smith said: "At the present time you have three fair contractors down there—that is, they work union people * * *. It is one of our rules that we don't work with non-union men."

That another labor representative said: "Under one condition, we will work for Brown & Root. If he signs an agreement with the National Trades Council on all work."

On the day this contract was given appellee, the Director of Utilities for Austin made the following report to the City Council: "Since the opening of these bids, we have had a meeting with union representatives of the various crafts in Austin. It has been brought out that Brown & Root, Inc., operate open shop. The other contractors who have contracts on our power plant operate under union shop agreements. The intimation was that if the City awarded the contract to Brown & Root, Inc., that there was a possibility of the union men quitting work on the construction program at the power plant."

The Austin Trades Council declared the entire Austin power plant project a "restricted area for union men."

A meeting was held by the City and interested parties on March 15th in an effort to reach an agreement, but this failed, when, as the Mayor testified, Mr. Sparks stated that appellee "would have to sign up and be treated like any other closed shop operator."

The testimony of Mr. Powell, one of appellee's attorneys who attended the meeting, was: "Q. Now, what was it Mr. Sparks said with respect to hiring men? A. Well, he just said we had to get all our men through the Austin Labor Temple, just like these other fair contractors, and they were not going to make any exception for us; that we were not in any position to demand something that they were not giving to these other people in this kind of business; if we thought we were going to get a better deal than the other boys, we were mistaken."

Picketing of this job commenced on March 15, 1950. All work on the project by other contractors who employed union labor only was then halted and did not resume until appellee had completed its part of the job and moved off.

Further evidence of the efforts of some appellants to induce a violation of Art. 5207a is found in the statements attributed to Mr. Richard J. Gray, President of the National Trades Council, American Federation of Labor, by Mr. Herman Brown. The matter arose in this way:

In 1949 appellee was associated with the Morrison-Knudson Company [2], in the construction of the Bull Shoals dam in Arkansas. The Morrison-Knudson Company used union men exclusively.

In June 1949 a meeting was held in Houston attended by Mr. Brown, Mr. Gray, Mr. Fortune (labor relations man of Morrison-Knudson Company), Ben Powell, one of appellee's attorneys, and Mr. Maloney (president of International Union of Operating Engineers).

At this meeting Mr. Fortune stated:

"He said he had called this meeting and asked Mr. Gray and Mr. Maloney to come down and meet with me to see if he couldn't work it out to where Morrison & Knudson would not be harrassed and embarrassed any more on their jobs in other sections of the United States.

"Q. Harrassed and embarrassed by whom? A. By the A. F. of L. Unions."

2. A large construction company.

Neither Mr. Maloney nor Mr. Gray took any exception to this statement.

Mr. Gray wanted to make an agreement for the International Unions of the Trades Council with Brown & Root concerning the Bull Shoals dam in Arkansas being contracted by Brown & Root.

Mr. Brown testifying:

"A. Well, of course, he wanted us to go on all of our work and asked if we couldn't go alone on all of our work, but he was particularly interested in getting Bull Shoals straightened out at that meeting.

"Q. Well, go along on all of your work or Bull Shoals. On what basis did he state? A. Go along with the union on all of our work.

"Q. What, if anything, did he say about going along? On what basis did he say? A. Using union men altogether."

At this same meeting Mr. Maloney "wanted to get us to use his men on highway work down here. He was very anxious to get started in that phase of construction and, if I would go along with him, the rest of them would go with me; he felt like they would. * * * He wanted us to use his men exclusively. * * *

"Q. What did he say in connection with your going along with him on your work that came within the jurisdiction of the International Union of Operating Engineers with respect to whether or not he would furnish you a portion of the men or all of the men on the jobs? A. No. He wanted all of them.

"Q. Is that what he said? A. Yes, sir."

A subsequent meeting was held with Mr. Gray in Hot Springs, Arkansas, in November 1949. Mr. Powell and Mr. W. J. Stuhr (international representatives of International Union of Operating Engineers) were also present.

"The whole discussion there was regarding Brown & Root. They wanted to make an agreement with Brown & Root for all of its operations.

"Q. Now, who said that? A. Both Mr. Gray and Mr. Stuhr. Mr. Gray did most of the talking * * *.

"Q. What was his suggestion, if any, Mr. Brown, with respect to whether you would be operating on a closed shop basis or an open shop basis? A. Well, a closed shop basis. * * *

"Q. Did you or not raise the question at that conference that in some states, Arkansas and Texas, possibly others, that that would be against the law for you to make such an agreement as that? A. I think we discussed that, yes, sir.

"Q. What, if anything, did he say with respect to whether that should be in a written agreement or a side agreement? A. It would just be understood; it would not be written.

"Q. Just how did he express that? A. Well, it would be understood, but it would not be in the contract.

"Q. What would be understood? A. That we would work union men.

"Q. A portion of them? A. All of them.

"Q. All union men? A. Yes, sir."

 The evidence being sufficient to show that appellants' activities were for unlawful purposes, the injunction does not deny appellants any constitutional rights.

We will discuss appellants' fifth point last.

By points six, seven and eight appellants say: The trial court erred in holding that the activities of appellants amounted to an unlawful conspiracy in restraint of trade; that all appellants against whom there is no evidence of unlawful activity should be relieved of the injunction, and that no concert of action is shown as between the Beaumont, Houston and Austin appellants.

The statements in appellants' brief are to the effect that: The Building Trades Councils (Beaumont, Houston and Austin) are aggregations of local unions and function as a vehicle through which the constituent union members deal together with employers in the locality in the establishment of wages, hours and working conditions—industry-wide. The Texas State Federation of Labor is a state-wide aggregation of labor unions which meet in convention, exchange information, and pass resolutions with respect to policy to be

recommended to members. Local labor unions are groups of working men in a particular locality who are engaged in similar craft functions and who have combined for the purpose of dealing collectively with employers.

The secretary of the Texas State Federation of Labor testified that the defendant trade unions were affiliated with the Building and Construction Trades Department of the American Federation of Labor (later referred to just as A. F. of L.). It was agreed that A. F. of L. had granted charters to the Austin, Houston and Beaumont Building Trades Councils. With the exception of one (to be later noticed), the appellant local unions are shown to be affiliated with or members of the local Trades Councils of their respective areas, or the Texas State Federation of Labor, or both.

A weekly column entitled, "The Man Behind the Scenes," is distributed by the Texas State Federation of Labor.

The dispute (or fight as it is referred to by appellants) of appellants with appellee is wide spread and has continued for some years past. The extent of this fight is reflected by the following: A letter from a representative of the International Union of Operating Engineers, which refers to a statement by appellee's president that a job in Arkansas (Bull Shoals) was to be an open shop job. The letter stated that all contractors on that job, except appellee, were under contract throughout the United States with local unions of that International, and requested a meeting with appellee to see, "if we couldn't get this matter straightened out." Following this letter there was a meeting of appellee's president with the president of A. F. of L., supra; a request for a closed shop contract was made and was refused by appellee. Later, during the negotiations of a construction contract with appellee, a Mr. Arnold, the sales manager for Banks Moreland Company in Houston, was advised by the district representative for the unions that all of appellee's jobs would be picketed regardless of where they were. There is evidence in the record that some appellants, on other jobs, refused to handle or work with supplies of concerns who had made deliveries to appellee's jobs, and, also, had refused to recognize contractors who had done contract work for appellee.

A representative of the Missouri State Council of Carpenters, reporting to the Sabine Area, Texas State Council of Carpenters, United Brotherhood of Carpenters and Joiners of America at their annual convention held in Beaumont, June 1949, referred to the dispute with appellee in Texas and said they were having the same trouble in Missouri on the Ozark dam job. At the 1950 convention of the Texas State Federation of Labor held at Beaumont, a report was made by the Federation's attorney, wherein appellee was discussed as operating in opposition to unions. At this convention, after referring to appellee's Austin job, the attorney said:

"In these and other cases we have found that, though operating in traditional manner may run afoul the law, there's more than one way to skin the cat. Don't let anybody tell you that it can't be done. That was what appeared when Fort Worth rats with union cards in their pockets sued their own Carpenters Union for damages and injunction. But before injunction was issued, Paul Sparks and I conferred with and suggested to the local union a change in the local by-laws, which will permit the union to accomplish the same end by somewhat different means.

"Don't let these employers and their high-collared lawyers tell you you can't do it. Operate within the law, but get the job done. For with a little precaution and preparation we can find a lawful way to get around, through, over or under most of these laws which seek to destroy us, and it is our responsibility to see to it that unions are protected to the end that decent wages and conditions are brought to all Texas workingmen, and I'm sure these objections will be accomplished, come Brown & Root or hell or high water."

This report was unanimously approved and the attorney was given a vote of thanks.

The minutes of the Houston Trades Council, February 23, 1950, recite: "Letters were then read regarding some of the

local unions in Seattle, Washington, working for Brown & Root Construction Company in Anchorage, Alaska. Secretary Jones explained these letters would be brought up before the national executive board of the Building & Trades Department for the purpose of pointing out that Brown & Root were having labor difficulties on any and all jobs, regardless of the area that the work may be under construction."

On February 14, 1950, the secretary of the Houston Trades Council reported that he had met with the National Executive Board of the A. F. of L. in Miami and that he had been assured that they would get one hundred per cent cooperation from the Building Trades Department and the affiliated unions in regard to the dispute with appellee.

The Texas State Federation of Labor sends a weekly news letter to ninety-one or ninety-two places in the State, the same being sent to central union bodies, to the past and present members of the executive board, and to prominent local unions. These letters refer to the fight with appellee in Austin and Houston. The column, "The man Behind the Scenes," was published in Texas newspapers. It referred to appellee and its troubles with the unions in Beaumont; appellee's Austin job; that the letting of the Austin job to appellee was protested by the unions with a warning that trouble would result, and that a picket line had been established on that job. Referring to the outbreak of the Korean war this column recited:

"Certainly, with the war demands and the other influences a defense or war economy will have, there is no lessening in demand for skilled labor in sight.

"It is a lot better to meet that demand with good union men than to let the Brown & Root crowd get the contracts with non-union men."

We have already shown that the dispute of appellants with appellee at Beaumont, Houston and Austin was in opposition to its open shop policy, and was for an unlawful purpose. As to these local unions the evidence shows that they were united in their respective local fights against ap-

pellee and that the picket lines on appellee's jobs in those localities were supplied and supported by the concerted action of those respective groups. The affiliates of these local unions—the Trades Councils of those respective areas, the State Federation of Labor, the Internationals, and the A. F. of L. were carrying on a fight against appellee to force it to enter into closed shop contracts and agreements. In the furtherance of this common purpose and design, the various affiliates furnished encouragement and aid to the locals, and the acts done by the one in an effort to accomplish a common purpose became the acts of all. 9 Tex. Jur., p. 396, § 17, and p. 403, § 23.

On January 10, 1950, the president of A. F. of L., supra, spoke to the Houston Trades Council, advised them to make the fight against appellee, and assured them that the international trades unions would give them aid. This Council levied an assessment of forty cents per member per month to be levied against the building trades cards for the duration of "this program."

In company with others, Paul Sparks, secretary of the Texas State Federation of Labor, and Chester Smith, president of the Austin Trades Council, met with the city officials of Austin in protest of the city letting a contract to appellee,—this contract is above referred to as appellee's Austin job. At this meeting Paul Sparks said: "We want to have a little information and discussion to see if you are going to let the contract to Brown & Root. These men are union men and Brown & Root does not work union people." And further that, "Union men won't work with non-union men." Chester Smith said: "It is one of our rules that we don't work with non-union men."

A representative of International Boilermakers Association said:

"Under one condition we will work for Brown & Root. If he signs an agreement with the National Trades Council on all works. * * *

"We will not furnish Brown & Root men for this job unless he signs an agreement for all jobs."

■ The evidence of appellants' activities at Beaumont, Houston and Austin, together with the evidence of their national and state-wide activities through their various affiliates, is sufficient to sustain the charge of conspiracy under the rules applicable on this appeal.

"On application for a temporary writ the right to be protected and the impairment thereof need not be established with absolute certainty. All that is required is proof of a probable right and of danger to that right unless the injunction be granted." 24 Tex.Jur., p. 183, § 136.

"In all appeals from interlocutory orders granting or refusing a writ or dissolving or refusing to dissolve one, the sole question is whether the trial court abused its discretion in entering the order appealed from. Many cases enunciate the rule that the grant or refusal of an injunction or a dissolution or refusal to dissolve will be reversed only when a clear abuse of discretion is shown; and if the order was based on conflicting evidence or diverse inferences it will not be disturbed. The evidence is not reviewed for sufficiency as it would be upon appeal from a final judgment, but only to see if it supports the court's exercise of discretion." 24 Tex. Jur., pp. 313–14, § 253.

We find nothing in the record as to Bricklayers No. 12 showing any action taken by it, or its affiliates, against appellee. We are of the opinion that Bricklayers No. 12 should not have been included in the judgment awarding temporary injunctive relief.

With this exception points six, seven and eight are overruled.

Points nine and ten are jointly briefed and will be discussed together.

These points are that the procedure adopted by the trial court was unauthorized and resulted in excessive costs for which appellants should not be liable.

The procedural matters complained of are:

1. Appointment of a Master in Chancery.

2. The Master conducting hearings outside of Travis County.

3. Continuing restraining order in effect for a period of approximately six months.

■ We are of the opinion that none of these matters is now before this court for adjudication.

"In all appeals from interlocutory orders granting or refusing a writ or dissolving or refusing to dissolve one, the sole question is whether the trial court abused its discretion in entering the order appealed from." 24 Tex.Jur., pp. 313–14.

"In accordance with the general rule that upon an appeal from an interlocutory order review is restricted to the propriety of the order, the review on appeal from an injunction order does not extend to the merits of the main case, to any collateral orders, or to subsequent injunction orders. Other orders preceding the grant of injunction or made therewith are not reviewed on the appeal unless they were necessarily involved and material to the right to injunction." 24 Tex.Jur., pp. 308–09.

These rules are supported by many authorities cited in the text and many others may be found in the 1937–47 Texas Jurisprudence Supplement under the same sections from which we have quoted.

■ Since appellants claim of excessive costs is based primarily upon those matters which we have held are not now before us, and since the case has not been tried upon its merits, and since the trial court has not expressly adjudicated or taxed any costs, the question of costs will be determined by the trial court in accordance with the entire record and the facts before it upon final trial.

Bruni v. Vidaurri, 140 Tex. 138, 166 S. W.2d 81, loc. cit. 95. See also Cohen v. Strange, Tex.Civ.App., Austin, 175 S.W. 1107.

These instructions pertain to all items of costs included in the cost bill in the transcript in this Court, except the item of $192 for transcripts 1–8. This item as well as the costs incurred in this Court are taxed

950

against appellants, other than Bricklayers No. 12.

The eleventh and last point made by appellants is that the Court erred in continuing the hearing after they had agreed to the issuance of an injunction.

 If appellants are correct in asserting that the injunction order proposed and agreed to by them should have been accepted by appellee and the Court and the hearing ended, a point we do not decide, then the only injury suffered by appellants is as to costs. The whole question of costs, with minor exceptions, has been reserved for adjudication upon final trial. This point is, therefore, overruled without prejudice.

We will now discuss appellants' fifth point in which complaint is made that the injunction granted is too broad and deprives them of the right of free speech.

 The trial court inserted a provision in its order, copied above, for the evident purpose of restricting the scope of the injunction to unlawful activities on the part of appellants. We do not approve, however, the form of such provision and the same is hereby deleted from the injunction order, and in lieu thereof the following provision is incorporated in such order: "The application of this injunction is to be confined to picketing for unlawful purposes heretofore specified, and is not to be construed to prevent peaceful picketing at proper places for lawful purposes, or other methods of publicizing any legitimate protests which defendants may have against plaintiff."

This modification of the injunction is taken almost literally from the opinion of our Supreme Court in the Stephenson case, supra. See also North East Texas Motor Lines v. Dickson, 148 Tex. 35, 219 S.W.2d 795, 11 A.L.R.2d 1065.

The injunction order is reversed and dissolved as to appellant Bricklayers No. 12; as to all other appellants the injunction is· modified as herein directed and as modified the order is affirmed.